J. S72026/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| HOLLY ANN CRAWFORD, | : | |
| | : | |
| Appellant | : | No. 2284 MDA 2015 |

Appeal from the Judgment of Sentence December 4, 2015
In the Court of Common Pleas of Luzerne County
Criminal Division at No.: CP-40-CR-0002431-2014

BEFORE: GANTMAN, P.J., DUBOW, J., and STRASSBURGER, J.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED DECEMBER 14, 2016**

Appellant, Holly Ann Crawford, appeals from the Judgment of Sentence entered by the Luzerne County Court of Common Pleas following her conviction by a jury of two counts each of First-Degree Murder and Criminal Conspiracy.[1]  After careful review, we affirm on the basis of the trial court's Opinion.

On April 21, 2014, Appellant and her boyfriend, James Roche, shot and killed the two victims, Ronald "Barney" Evans and his son Jeffrey Evans, in their home in Hunlock Creek, Pennsylvania.  We adopt the facts as set forth by the trial court.  **See** Trial Court Opinion, filed 3/1/16, at 3-35.  However, for purposes of the appeal, we note the following relevant facts.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a) and 18 Pa.C.S. § 903, respectively.

Several witnesses described Roche's anger toward Ronald Evans stemming from Appellant's previous intimate relationship with Ronald Evans, and Roche's history of violent behaviors involving firearms, including an incident where Roche fired a weapon at Ronald Evans' home.

Appellant admitted that on April 21, 2014, after a night of drinking and arguing about Appellant's previous relationship with Ronald Evans, Roche stated his intention to kill Ronald Evans. Appellant agreed to join Roche, and added that they should kill Jeffrey Evans as well. Roche and Appellant left their home with two firearms and returned approximately one hour later.

Police later found Ronald Evans and Jeffrey Evans in their home shot to death. A broken portion of the trigger guard police recovered from the Evans' home belonged to one of the firearms Appellant and Roche had taken from their own home, a .22 caliber rifle. When police attempted to arrest Appellant and Roche, they both fled into the woods near their home with seven knives and a wooden display case taken from the Evans' residence, as well as a loaded .44 caliber revolver.

After initially denying any involvement in the shooting and denying knowing Ronald and Jeffrey Evans, Appellant eventually admitted to being present at the time of the shooting. Appellant told police that she acted as a decoy when Ronald Evans initially refused to answer the door for Roche.

In addition, witnesses described Appellant's suspicious behaviors indicating her consciousness of guilt, including plans to flee to Philadelphia

using her mother's vehicle and bank card, fleeing into the woods with Roche after Appellant's mother called the police, and statements to family members to watch the news because she "did something real bad." Trial Court Opinion, filed 3/1/16, at 15. Appellant admitted to her daughter that she shot Ronald and Jeffrey Evans in the head and that she had no remorse, stating "[i]t was just like shooting a deer." *Id*. at 16.

On December 2, 2014, Appellant filed an Omnibus Pre-Trial Motion attempting to suppress her statements to police. On March 20, 2015, the trial court denied Appellant's suppression Motion after a hearing.

A jury trial ensued, at which numerous witnesses testified. During the testimony of Appellant's mother, Moya Linde, the court permitted the admission of a photo of the victims while alive despite Appellant's objection. The trial court provided a cautionary instruction.

On September 23, 2015, the jury convicted Appellant of two counts each of First-Degree Murder and Criminal Conspiracy. On December 4, 2015, the trial court imposed a term of life imprisonment.

Appellant filed a timely Notice of Appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents seven issues for our review, which we have reordered for ease of disposition:

> 1. Whether the trial court committed an error of law or abuse of discretion in denying [Appellant's] Motion to Suppress her oral statement.

2. Whether the trial court erred in allowing the Commonwealth to publish pictures of the victims while they were alive.

3. Whether the evidence was insufficient to convict [Appellant] on the crime of First[-]Degree Murder and Conspiracy.

4. Whether the trial court committed an error of law or abuse of discretion in failing to issue a jury instruction on Involuntary Manslaughter.

5. Whether the trial court committed an error of law based upon abuse of discretion [] in failing to issue a jury instruction on "ignorance or a mistake as to the matter of fact[."]

6. Whether the trial court erred in failing to issue a jury instruction as to whether [Appellant] was under a state of duress when the crime occurred.

7. Whether the trial court committed an error of law or abuse of discretion in failing to issue a voluntary intoxication instruction.

Appellant's Brief at 1.

Appellant first challenges the denial of her Motion to Suppress her statements to police. Our standard of review in an appeal from an Order denying a Motion to Suppress is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa. 2010) (citation omitted).

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006). Our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

After a careful review of the parties' arguments and the record, we affirm on the basis of the trial court's Opinion. *See* Trial Court Opinion at 17-20 (incorporating the 3/20/15 Trial Court Opinion, and concluding it properly denied Appellant's Motion to Suppress her statements to police because Appellant knowingly, intelligently, and voluntarily waived her *Miranda*[2] rights as demonstrated through the written waiver and testimony from police about the circumstances of the statement and waiver).

Appellant next avers that the trial court improperly admitted "pre-death photographs of the victims[,]" arguing that the photographs were "irrelevant, prejudicial, and served no purpose other than to engender sympathy." Appellant's Brief at 16.

It is well settled that the "[a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Tyson*, 119 A.3d 353, 357 (Pa. 2015). "An abuse of discretion is not merely an error of

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id*. at 357-58.

Certain "life-in-being" evidence in the form of testimony showing the victim was alive at a time prior to the murder may be admissible during the guilt phase of a murder trial. *Commonwealth v. Jordan*, 65 A.3d 318, 333 (Pa. 2013). However, our Supreme Court has held that life-in-being evidence in the form of photographs of a victim prior to his or her death "are clearly irrelevant to [] the guilt or innocence of the accused[.]" *Commonwealth v. Rivers*, 644 A.2d 710, 716 (Pa. 1994).

Here, we agree with Appellant that the trial court improperly admitted the photographs of the victims while alive. Nevertheless, our review of the certified record and the arguments by the parties reveals that the error was harmless.

This Court will affirm the trial court's Judgment of Sentence despite trial court error if we conclude that the error was harmless. *Commonwealth v. Wright*, 742 A.2d 661, 667 (Pa. 1999). Our Supreme Court has noted that "[t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the

well-settled proposition that a defendant is entitled to a fair trial but not a perfect one." ***Commonwealth v. Thornton***, 431 A.2d 248, 251 (Pa. 1981) (quotation and citations omitted).

"Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Commonwealth v. Melvin***, 103 A.3d 1, 20 (Pa. Super. 2014) (quotation and citations omitted).

In this case, the Commonwealth introduced substantial evidence that established that Appellant had committed the crimes of First-Degree Murder and Criminal Conspiracy. As described by the trial court and confirmed by our review of the record, Appellant admitted to numerous acts and statements supporting her convictions, including her conversation with Roche prior to the murders and her confessions of guilt to family members. In light of this evidence and the trial court's cautionary instruction to the jury, any prejudice to Appellant was *de minimis*. We, thus, conclude that the trial court's error was harmless, and Appellant's challenge to the admission of the photographs fails.

Appellant next challenges the sufficiency of the evidence supporting her convictions for First-Degree Murder and Criminal Conspiracy. We review claims challenging the sufficiency of the evidence by considering whether, "viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Melvin*, 103 A.3d 1, 39 (Pa. Super. 2014).

The trier of fact—while passing on the credibility of the witnesses and the weight of the evidence—may choose to believe all, part, or none of the evidence. *Id*. at 40. Moreover, a jury may base a conviction solely on circumstantial evidence. *Id*. In conducting our review, the appellate court may not weigh the evidence and substitute its judgment for that of the fact-finder. *Id*. at 39-40.

It is well-established that "[t]o sustain a conviction for murder of the first degree, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific intent to kill." *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015); 18 Pa.C.S. § 2502(a). "Section 2502 of the Crimes Code defines murder of the first degree as an 'intentional killing,'" which, in turn, is defined as a "willful, deliberate and premeditated killing.'" *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013) (citing 18 Pa.C.S. § 2502(a), (d)). "[T]he period

of reflection required for premeditation to establish the specific intent to kill may be very brief; in fact[,] the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Hitcho*, *supra* at 746.

To sustain the conviction for criminal conspiracy, there must be proof beyond a reasonable doubt that the defendant "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy. This overt act need not be committed by the defendant; it need only be committed by a co-conspirator." *Commonwealth v. McCall*, 911 A.2d 992, 996 (Pa. Super. 2006) (citation and quotation omitted). *See also* 18 Pa.C.S. § 903.

The Honorable Fred A. Pierantoni III, sitting as the trial court, has authored a comprehensive, thorough, and well-reasoned opinion, citing to the record and relevant case law in addressing Appellant's sufficiency claims. After a careful review of the parties' arguments and the record, we affirm on the basis of the trial court's Opinion. *See* Trial Court Opinion, 3/1/16, at 51-56 (concluding that the evidence was sufficient to support Appellant's convictions based on Appellant's conversation with Roche about the shooting, Appellant acting as decoy, Appellant's presence and actions in the home during the shootings, Appellant's flight with Roche after the shooting,

Appellant's admissions to police, Appellant's inculpatory statements to third parties, and the circumstantial evidence indicating Appellant's consciousness of guilt).

In Appellant's last four issues, she claims that the trial court improperly failed to issue certain jury instructions she had requested, including instructions regarding Involuntary Manslaughter, ignorance or mistake, duress, and voluntary intoxication.

Our standard of review in assessing a trial court's jury instruction is as follows:

> When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that[] it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014). "The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal." *Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013).

After a careful review of the parties' arguments and the record, we affirm on the basis of the trial court's Opinion. *See* Trial Court Opinion, 3/1/16, at 36-50 (concluding: (1) Appellant was not entitled to an

Involuntary Manslaughter jury instruction because Appellant's defense at trial was that she did not kill the victim and there was no evidence to support such an instruction; (2) Appellant was not entitled to an ignorance or a mistake of fact jury instruction because the evidence did not support such an instruction where Appellant claimed throughout the trial "that she did not plan, intend, agree to participate[,] or participate in the killing of one or both of the victims[;]" (3) Appellant was not entitled to a duress jury instruction because there was no evidence of a present and impending threat and Appellant did not actually admit to engaging in the charged conduct as required by 18 Pa.C.S. § 309(a); and (4) Appellant was not entitled to a voluntary intoxication jury instruction because there was no testimony or evidence that Appellant's alcohol use overwhelmed or overpowered her faculties or sensibilities in any way).

The parties are instructed to attach a copy of the trial court's Opinions dated March 20, 2015, and March 1, 2016, to all future filings.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2016

- 11 -

COMMONWEALTH OF PENNSYLVANIA: IN THE COURT OF COMMON PLEAS

                                 :      OF LUZERNE COUNTY

             V.            :

HOLLY ANN CRAWFORD,

        Defendant      : No. 2431 of 2014

## OPINION

## PROCEDURAL HISTORY

Subsequent to a jury trial concluding on September 23, 2015 the defendant in above captioned matter was convicted of two counts of first-degree murder for the killing of 73 year old Ronald "Barney"[1] Evans and his son Jeffrey Evans in their home, located at 71 Sunset Lake Road, Hunlock Township, Luzerne County. The defendant was additionally found guilty of conspiring with her boyfriend, James Roche, to commit these murders.

On November 17, 2015 this court granted trial counsels' motion to withdraw and appointed conflict counsel to represent the defendant. Sentence was imposed on December 4, 2015, and counsel filed a notice of appeal on December 15, 2015. An order was issued pursuant to Pa. R. A. P. 1925(b) on December 15, 2015. An

---

[1] Mr. Evans is referred throughout the trial transcript interchangeably as Ronald and Barney.

1

order was issued on December 30, 2015 granting appellant's request for an extension of time within which to file the concise statement.

Appellant's concise statement was subsequently received on January 20, 2016 and the Commonwealth submitted a response on January 27, 2016.[2]

The following is a verbatim iteration of appellant's Concise Statement of Errors Complained of on Appeal:

1. Whether the trial court committed an error of law or abuse of discretion in failing to issue a jury instruction on Involuntary Manslaughter.

2. Whether the trial court committed an error of law or abuse of discretion in failing to issue a jury instruction on "ignorance or mistake as to the matter of fact". Defendant argues that a reasonable explanation negates intent, knowledge, belief, recklessness or negligence required to establish the material elements of the offense charged. Defendant further argues that her belief that James Roche, her co-defendant, would not follow through with his threats was reasonable because he had never followed through before. Testimony revealed that Roche made repeated, almost daily threats about Ronald Evans and never took action.

3. The trial court erred in failing to issue a jury instruction as to whether Defendant was under a state of duress when the crime occurred in light of co-defendant, James Roche's constant physical abuse.

4. Whether the Commonwealth failed to prove beyond a reasonable doubt that the Defendant conspired with James Roche to kill Ronald and/or Jeffrey Evans.

---

[2] The Commonwealth's response consists of briefly stated general principles of law lumped together under multiple allegations of error. The Commonwealth fails to succinctly address, with any specificity, the issues raised by appellant. The Commonwealth references no witnesses, testimony or law in opposition to the appellant's submission. It therefore provides literally no assistance to this court, particularly in a case of this nature, in articulating or explaining the Commonwealth's position. If the Commonwealth intends to offer such a "response" in the future we suggest it simply advise the court none will be filed. We hasten to add this court has received several previous responses where counsel has articulated, with appropriate reference to the transcript/evidence and applicable law, a position which informs and assists an examination of the issues raised on appeal.

2

5. Whether the trial court committed an error of law or abuse of discretion in failing to issue a voluntary intoxication instruction.

6. Whether the trial court erred in allowing the Commonwealth to publish pictures of the victims while they were alive in that they were prejudicial, inflammatory and irrelevant, and any evidentiary value is outweighed by the likelihood that they will inflame and prejudice the jury.

7. Whether the evidence was insufficient to convict the Defendant of the crime of First Degree Murder and Conspiracy. Defendant argues that the evidence is insufficient to prove that she acted with malice, had a specific intent, or conspired to kill either of the victims, Ronald or Jeffrey Evans. See Defendant's testimony that she went to the victim's residence solely to get pills when James Roche shot and killed the victim. (N.T. p. 762-771).

8. Whether the trial court committed an error of law or abused its discretion in denying Defendant's Motion to Suppress her oral statement. Defendant argues that at the time of the statement, she was either under the influence of alcohol or drugs or withdrawing from the same and thus, said statement was involuntary.

We will subsequently discuss the difficulty in addressing several of the allegations of error, given their lack of compliance with applicable appellate law, however, it is necessary to set forth a factual background summarizing relevant portions of the testimony and/or evidence as they relate to the issues raised.

## FACTUAL BACKGROUND

The critical dates throughout the presentation of evidence are Monday, April 21st; Tuesday, April 22nd and Wednesday, April 23rd, 2014.

Moya Linde was called by the Commonwealth and stated she has resided at 71 Dobson Road in Sweet Valley since 1980. The two-story residence, with a

3

basement, contains sheds and a mobile home a short distance from the structure. Ms. Linde is the defendant's mother and grandmother of Tristin Crawford and Alexa Balma, both daughters of the defendant.

In April of 2014 Holly Crawford and her boyfriend, James Roche, were staying at the aforementioned trailer, located on Ms. Linde's property. The witness related the pair had been dating for approximately one year and eight months. Additionally, Alexa Balma was residing with Ms. Linde for a period of approximately ten years. The witness had legal custody of Alexa and provided for her financial support. During April 2014 Alexa was attending Luzerne County Community College.

Ms. Linde identified two long guns which she indicated were kept in her home. The first a .22 caliber single shot bolt action rifle. The second, identified as Commonwealth's exhibit 15, was a .22 rifle semi-automatic, which she stated was "broken".

The first firearm, Commonwealth's exhibit 14, was described as Ms. Linde's gun and kept in a gun cabinet. The defendant "liked to target practice" with this weapon. (Trial Transcript N.T. 219).

Ms. Linde stated she was unaware how the second firearm "became broken". She further indicated that Holly Crawford also used this firearm, hunting for deer.

4

Ms. Linde testified that James Roche brought guns from his father's home located in Mountaintop, Pennsylvania.

The witness related she knows Ronald Evans by his nickname "Barney". Barney was described as "Holly's friend" and a friend of the family. Ms. Linde testified that Holly Crawford had an "intimate" relationship with Barney for a "couple years". Barney lived in Hunlock Creek, approximately 15 to 20 minutes away, and Linde had been at his home several times.

The witness next identified Commonwealth's exhibits 16 and 17, photographs of Barney Evans and his son Jeffrey, who lived with Barney. (Id. N.T. 225, 226).

The witness indicated that the relationship between Jim Roche and Barney Evans was "hostile", stating Roche "hated" Barney and often cursed about him. Ms. Linde further related that Holly Crawford was aware of Roche's hostility toward Barney.

Ms. Linde was next questioned regarding the events of Monday, April 21, 2014.

Moya Linde testified that during the early evening hours she, Alexa Balma, Holly Crawford and James Roche were present at her residence. Alexa downloaded a movie called Boondock Saints and then went upstairs. Ms. Linde stated all three adults were consuming alcohol "getting intoxicated". All three were awake and talking and Holly Crawford was "jabbering on about something in

5

the movie". (Id. N.T. 235). Ms. Linde further described Holly Crawford as a "little more drunk" than herself and Roche.

Ms. Linde testified the defendant drank daily and was "drunk alot", however, "functioned pretty much most of the time". (Id. N.T. 235).

Ms. Linde next testified that the movie was paused and Holly Crawford and Roche started arguing about "Barney again" and the witness heard Roche say "I'm going to kill that son of a bitch, going on, ranting and raving." (Id.N.T. 236).

Ms. Linde described the defendant as trying to "brush it off" and "pacify him". Linde told Roche "You can't go around killing people; and he said to me. Yes I can, I can kill you". (Id. N.T. 237).

Linde further testified that Holly Crawford tried "to talk him out of his mood that he was in."

> Next thing I know, Jim got up. I think he put a jacket on, started walking past me to the back door; and, Holly got up and started walking towards Jim; and Jim said to Holly, "You don't to come. I don't want you involved" to which Holly responded "Oh, I'll go for the ride". (Id. N.T. 238).

When asked by the assistant district attorney whether either the defendant or Roche had a gun she replied that Roche had a gun with a strap over his shoulder.

Linde then went to sleep and didn't see her daughter and Roche until the next day. The witness stated she thought her daughter and Roche walked into the woods "because they came down later". (Id. N.T. 240).

6

Alexa Balma expressed concern to her grandmother about Barney and Jeff and while Ms. Linde was driving Alexa to school they went "down Barney's road" and drove past his home. The timeframe was approximately 2:00 p.m. on Tuesday, April 21st.

At approximately 6:00 p.m. that evening the defendant's daughter, Tristin, came to the residence. Linde stated she had not seen Tristin for approximately 18 months. Tristin came to the residence in response to a call from the defendant. (Id. N.T. 244).

On Wednesday, April 23, 2014, Holly Crawford came into Linde's bedroom and stated she needed a ride to Philadelphia. Ms. Linde declined and stated Roche should drive her to which the defendant responded "Well, I want him- - he's going to be staying with me so, if he drives, you won't get your car back. You won't be able to have your car." (Id. N.T. 245).

Ms. Linde testified that Crawford and Roche had her credit card and keys to her vehicle and "[T]hey took off down the driveway; and, the first thing I did was call the credit card company and have the card stopped". (Id. N.T. 246). The next thing Linde did was call "the State Police and told them my credit card and car had been stolen". (Id. N.T. 246). Additionally, while on the phone, Alexa urged Linde to ask the State Police to check on the welfare of Barney and Jeff, which she did. (Id. N.T. 247).

7

Shortly thereafter the defendant and Roche arrived and Crawford stated "I need $200". At that time the police called Linde and Holly Crawford overheard the conversation. The defendant stated "We better move. We better leave." (Id. N.T. 249). Roche went into the basement and retrieved "a gun and a soft gun case". The two left the house in approximately 10 minutes. They went into the woods and Linde described her daughter as "pretty loaded".

After the defendant's arrest, Linde received approximately 15 letters written by Holly Crawford while she was incarcerated. Linde identified some of these letters and was asked to read portions of them. Counsel thereafter agreed to stipulate to excerpts from the letters, which were read to the jury at pages 264 through 266 of the trial transcript.[3]

Ms. Linde next described two incidents of violence by Roche. The first which occurred "a couple months or more before April 21st" involved Roche pushing Holly Crawford off a stool onto the floor. The second occurred when Roche apparently thought Crawford was attacking Linde and then assaulted Crawford. (Id. N.T. 268 through 270).

Linde also testified to hearing arguments between the defendant and Roche and when asked who initiated them responded "I would say Jim initiated them

[3] The Commonwealth subsequently confronted the defendant with these letters and argued during closing they were instructing her mother how to testify during trial and further Holly was attempting to protect James Roche. (Id. N.T. 1062, 1063). In response to a question submitted by the jury during deliberations the stipulations were read . (Id. N.T. 1173 through 1178).

8

some of the times, and Holly initiated them some of the times". (Id. N.T. 271).

When asked how the defendant would initiate an argument the witness replied "She was very jealous. If he would be looking at girls going into the liquor store, something, and that would be something. ... That would trigger a flare-up with [Roche]." (Id. N.T. 272).

During cross-examination Ms. Linde reiterated being aware of an incident where Roche assaulted Holly Crawford resulting in broken ribs and a trip to the emergency room. (Id. N.T. 277).

The witness additionally reiterated hearing Roche utter threats to kill Barney on an almost daily basis. During these threats Linde related "we would try to calm [Roche] down".

Ms. Linde further testified about the defendant's use of "pills and alcohol" as a daily occurrence. The witness further indicated that Crawford would smoke pot when she was able to obtain it. Linde stated that Holly Crawford was "drunk on a daily basis", from a timeframe approximately six months before her arrest.

When questioned regarding the night of April 21st Ms. Linde related that Holly Crawford discussed "Klonopins being stolen from her purse" on and off during the prior week. Linde stated that Crawford advised her that Crawford's purse was left in Barney's car and Klonopin was inside the purse. The witness

9

further related Holly Crawford "thought Barney took them for Jeff, because he was also on Klonopin and was always running out and wanted more". (Id. 283).

The witness further stated that the family would frequently consume beer.

Linde additionally testified that Barney Evans gave Holly Crawford money to "buy stocks". Barney Evans also brought food to the house and supplied Holly Crawford with "booze" and marijuana.

Linde further testified that Roche was always "bitching" about the defendant's boyfriends.

Upon further cross-examination Ms. Linde stated that while watching Boondock Saints something reminded Roche of Barney and he "flipped out". (Id. N.T. 289).

Linde further related a previous incident where Roche and Holly Crawford were "driving around" when Roche jumped out of the vehicle and fired a gun in the general direction of Barney's house. (Id. N.T. 291).

The witness also related an additional incident where "we" went to Barney's house to warn him that Roche was on the way and Barney displayed a gun stating "See this ? This is what he's going to get if he comes here". (Id. N.T. 295).

10

Apparently, during an additional incident where Roche "had shot the bullets going down the driveway when I picked Alexa up from LCC." Linde went to Barney's home to see if he was okay and described him as "shaking like a leaf". [4]

Tristin Crawford assumed the stand and described the defendant as her biological mother. In April of 2014 Tristin was living with her father. She received a call from Holly Crawford. Crawford related that she needed to tell Tristin "something" and further that "something bad happened". The defendant further advised Tristin "To watch the news". (Id. N.T. 317). Tristin obliged but did not see anything.

Tristin's father took her to Moya Linde's home at 71 Dobson Road on April 22, 2014. The witness testified she had not seen her mother for "at least, 2 years or more". (Id. N.T. 318). Tristin further stated this was the first time she met Roche.

Tristin related a conversation she had with her mother while sitting at the kitchen counter. Holly Crawford stated, in part, "Barney and Jeff had been shot in the head". (Id. N.T. 319). The witness was then asked whether anyone said anything in response to the defendant's comment. Tristin responded "Remorse was mentioned" by Alexa after which the witness described Holly Crawford thusly, " Her eyes-- she looked up, and her eyes were filled with tears, and she

---

[4] The transcript employs the word "leave" which is an obvious error. (Id. N.T. 295).

11

mentioned about, like a deer. ... It was mentioned about just being like a deer." (Id. N.T. 320).

At the conclusion of direct examination Tristin indicated she had never met and did not know "Barney".

During cross-examination the witness indicated she did not meet James Roche until approximately 1 hour after she arrived at the residence and that Roche came from "upstairs".

Alexa Balma testified she is currently 20 years of age and lived with her grandmother at 71 Dobson Road "all my life". Alexa stated she knows Ronald Evans and described him as her mother's "friend" for approximately 5 years. The witness further related the defendant had an "intimate" relationship with Mr. Evans.

Ms. Balma further indicated James Roche was her mother's boyfriend and every time Roche was around, the defendant "would cut off all communication with Ronald". (Id. N.T. 325).

This witness additionally testified she heard Holly Crawford discuss Barney Evans in Roche's presence "many times". During these discussions the witness stated Roche would "get very hyped up. ... he would degrade him, call him names,

12

not all pleasant." (Id. N.T. 325). In this regard Alexa indicated Holly Crawford knew Roche did not like Barney as Roche threatened Barney many times.

Alexa further testified that she knew Barney's son, Jeff Evans.

In describing the events of April 21, 2014, Balma initially indicated that at approximately 6:00 p.m. she put on a movie, Boondock Saints, and then went upstairs. She further related that although upstairs she could hear the three adults "clearly".

Alexa testified that in April of 2014 her mother drank "every day"and further "drank to excess" although she could still do things around the house-activities of daily living. (Id. N.T. 330).

Alexa next related that during a gun fire scene, the movie was shut off, and she heard James Roche talking about Barney in a "very aggressive, very hyped up" tone, stating, "I should go over and kill him, shoot him". (Id. N.T. 331). The witness related the following:

Q. When Jim made that statement, did anyone say anything in response?

A. Mother said, I'll go, too; something like that

Q. I'll go, too?

A. I'll go, too. Yes. I'll go, too.

Q. And, that was in response--

13

A. To what he was saying, yes.

Q. What was your mother's tone of voice?

A. Casual, I'd have to say. That is the only way I can describe it as, casual.

Q. You didn't have any trouble hearing them ?

A. No.

Q. Did anyone say anything about Jeff at that point ?

A. Jeff. Mother made a comment that, You should get Jeffrey, too, because he had to put his cat, Bailey, down.

Q. What did she say about Jeff, that she had what ?

A. That they should kill him, too, because he had to put the cat, Bailey, down.

Q. Did you have any trouble hearing those words being spoken by your mother ?

A. No.

Q. When you heard this exchange take place, what did your mother and Jim do next?

A. I heard them get into the car and leave.

(Id. N.T. 331, 332).

Alexa further testified that she then heard Crawford and Roche get into the car and leave and that they were gone for about an hour. When they returned Moya Linde asked "[I]f they did it; and they said, no, they were just driving around". (Id. N.T. 333).

14

Alexa was asked about the type of guns in the home and she responded, in part, that her grandmother owned a .22 and her "mother kind of adopted that gun, and that was her gun." (Id. N.T. 333).

The next morning at approximately 7:00 a.m. Alexa was on the porch when her mother and Roche pulled into the driveway and stated they went to a local store to obtain cat food. As Holly Crawford walked up the steps to the residence she looked at Alexa and stated "...I did something very bad. Watch the news. I know you can understand. Watch the news. I know you will understand, she said. I did something real bad. I know you will understand. Watch the news." (Id. N.T. 335). In response Alexa asked Roche if he knew what her mother was talking about and he professed not knowing.

When asked by the assistant district attorney whether she had concerns regarding the safety of Barney and Jeff, Alexa responded "I didn't think it was true, because they've said multiple statements like that so many times before." (Id. N.T. 336).

Alexa did in fact examine the computer and on her way to school asked her grandmother to drive past Barney and Jeff's home to see if they were "okay". Her grandmother complied "[B]ut she told me not to get involved, to not get out. So, we just turned around, and she took me to school". ( Id. N.T. 337).

15

When Alexa returned home from school that evening she had further discussion with her mother concerning Barney Evans. The witness stated "She was hinting around about the bad things she had done; and, I told her to just say outright what she was trying to say; and, she said that she shot Barney and Jeff in the head." Alexa then asked whether her mother had any remorse and the defendant stated "...No. It was just like shooting a deer." (Id. N.T. 338, 339).

On Wednesday April 23, Alexa related "My mother started saying to Jim or whoever would listen that she needed to get to Philly; that, I need to go to Philly, stuff like that". Holly Crawford obtained Moya Linde's bank card and was in possession of the keys to the vehicle. She and Jim started to drive away. Alexa testified her grandmother reported the car stolen and requested the police check on Ronald and Jeff "to see if they were all right". (Id. N.T. 341). Alexa further testified her grandmother cancelled the bank card and reported the car stolen. Approximately ten minutes later Holly Crawford and Roche returned indicating they couldn't get any money. Moya Linde advised the two she had called the police and in an aggressive manner Roche called Moya Linde a "cop caller". (Id. N.T. 343). At this time Alexa described her mother as going along with it and distressed. Alexa then observes her mother and Roche going into the woods. She further describes her mother as being able to walk and her speech was "a bit slurred, but you can understand what she was saying". (Id. N.T. 344).

16

In response to several questions posed by the assistant district attorney regarding Holly Crawford's decision making process, Alexa stated her mother was able to make decisions and would do what she wanted to do.

Alexa additionally testified about Roche's sometimes violent displays towards her mother, describing an incident which occurred approximately three months before April of 2014.

The witness further stated that her mother and Roche would frequently argue. When asked who started the arguments Alexa responded "My mother did". (Id. N.T. 347). When asked how her mother did this the witness indicated "[S]he would bring up Ronald's name or other ways to get [Roche] going". As a result Roche would become "[E]ither [ ] very distressed, very depressed and down; or, he'd get very angry, very aggressive". (Id. N.T. 347).

During cross-examination Alexa acknowledged that Roche could be intimidating, although she was not intimidated by him.

Alexa further stated that Holly Crawford had a prescription for Klonopin and would give Klonopin to Roche "...[N]ot just to calm him down, but she would give it to him just when he asked for it anytime, really." (Id. N.T. 350).

In response to additional questions during cross-examination the witness indicated Roche was aware of the sexual relationship between Holly Crawford and

17

Barney and further that Barney provided her mother with money and other items of value.

The witness also related the mention of Barney's name would make Roche aggressive and further that Roche made numerous threats towards Barney in the months leading up to April of 2014, although Balma did not take him seriously.

On redirect examination Balma was asked what would cause Roche to be in bouts of rage to which she responded her mother would often do things to set Roche off and when asked how often this would happen the witness replied "Often, it would. Often." (Id. N.T. 366).

Margaret Moran was called by the Commonwealth and initially indicated that in March of 2014 she was housed at the Luzerne County Correctional Facility. Ms. Moran stated she possessed a bachelor's degree in American Studies. In July of 2014 she contacted the Luzerne County District Attorney's Office through her counsel, indicating she had information regarding Holly Crawford.

Ms. Moran testified she met the defendant in late April of 2014. Moran and the defendant were among four individuals on "B" block. The witness related the defendant often spoke about her case and Moran was also familiar with the defendant through the defendant's aunt, Cheryl Cup, who was also incarcerated at that time.

18

In response to a question by the assistant district attorney regarding whether Crawford discussed her interview with the Pennsylvania State Police, Moran replied she did. "She thought it was funny"; "She was humored by it". (Id. N.T. 619). Crawford also told to Moran she was upset during the interview process since Roche got nine slices of pizza and she could only eat one or two.

Moran next advised the jury how Crawford communicated with Roche while the two were housed at the Luzerne County Correctional Facility. Moran stated that Roche was on "M" block and described the method Crawford used to communicate with him.

Moran further related she developed a friendship with the defendant and the defendant shared letters with Moran that she received from her mother, Moya Linde. Additionally, Crawford shared notes with Moran she received from James Roche. Indeed, Moran acknowledged she assisted Crawford in communicating with Roche.

Moran further advised the jury that Crawford asked Moran several questions regarding her mental health diagnosis. "[Crawford] was interested for her sake and for Jim's." (Id. N.T. 624.) In this vein, Moran stated Crawford asked several questions about what one would tell a psychiatrist or a psychologist in order to get a certain diagnosis. Crawford was "very interested in post-traumatic stress disorder". (Id. N.T. 624).

19

Ms. Moran further testified she and Crawford became cellmates for approximately one month and Crawford told Moran she met Roche at a "Slipknot concert with her daughter". (Id. N.T. 625). Moran additionally related she became familiar with Crawford's family members.

This witness also stated Crawford discussed hunting and shooting deer and told Moran many stories about Roche and guns. (Id. N.T. 632).

Moran related Crawford referred to Ronald Evans as "Barney" and stated that "She slept with him for money", prior to her relationship with Roche.

Moran next testified that Barney and James Roche were "very familiar" because of Crawford. When specifically asked whether Holly Crawford brought up Barney to Roche the witness replied "Yes. It seemed like all the time". Moran was next asked whether Crawford told her why she did this and the witness replied "It made him angry and jealous". (Id. N.T. 633).

Moran additionally stated that Crawford told her about incidents of violence regarding Roche, stating that Crawford related "that once she had a cracked rib or a broken rib".

Moran also advised the jury Crawford shared letters written by her mother to her, while she was incarcerated.

20

Moran was specifically questioned regarding whether Crawford discussed the plan to kill Barney and responded "Yes". Moran further stated that Crawford advised Barney was simply a problem in the relationship between her and Roche. The witness additionally testified that the discussion between Crawford and Roche regarding killing Barney was "pretty constant". (Id. N.T. 635).

Crawford told Moran "various versions" of what occurred on the night of April 21, 2014.

The first version was described as follows:

A.    They had had the plan that he needed to die for what seemed like for awhile, and they decided that that night was the night. I never had heard about any movie or anything like that. They had been drinking, but no more than they normally had been.

Jim collected the guns, put them in the trunk. They went over in her mother's car to where Barney lived. Holly got out of the car, got Barney to come to the door. Barney opened the door. They had a conversation. Jim shot Barney.

Then they went inside the house, realized that Jeff, the son, was there; and, he did something that attracted attention and made them feel like he was going to go call the Police, or something like that, and shot him, too.

Q.    After Barney and Jeff are shot, does she tell you what happens next?
A.    Yes.
Q.    What happens?
A.    They leave the house.
Q.    Do they take anything with them?

A.    Yes. Swords and knives, but only the ones that wouldn't attract attention.
Q.    What is the purpose of taking swords and knives? Are you told that?
A.    They were trying to make it look like a robbery.

21

Q.   What happens after Ronald and Jeffrey are dead? Where do they go? Does she tell you?

A.   At some point, Holly leaves the house and goes to the car before Jim. Jim drops a bloody gun in her lap, and they leave after they take stuff from the house. At some point, they go back to the mother's house, and then they figure out how to hide.

(N.T. 636, 637).

Moran thereafter described the second version, related by Crawford, as identical to the first except in the second version "Holly has a gun". In this second version Crawford shoots at Jeff but no one knows which bullets hit what. The purpose for taking items from the home is to make the murders appear as a robbery. This second version also includes plans to go to Philadelphia and sell the guns and yet another version to sell marijuana for money and bury the knives taken from the Evans residence. (Id.N.T. 638).

Ms. Moran additionally testifies that while the defendant and Roche were communicating with each other in prison they began to discuss Klonopin. Crawford acknowledges that Klonopin was not actually taken from her but that Jeff had several prescriptions, and the plan was to get more Klonopin; "[B]ut, the reason was created afterwards, that she was going to retrieve her property". When asked why the reason was created afterwards, Moran responded "They needed a reason to be there, and they needed a defense". (Id. N.T. 639).

22

Crawford further told Moran that she really did not want to break off the relationship with Barney since "[H]e was providing her with necessary money and money to buy her drugs". (Id. N.T. 640).

Holly Crawford further advised Moran that she liked to "rub" her relationship with Barney in Roche's "face". (Id. N.T. 641).

Pennsylvania State Trooper Stephen Polishan was assigned to the investigation of these homicides and responded to the area of 71 Dobson Road on April 23, 2014. Trooper Polishan, along with Corporal Stephen Turinski, interviewed Holly Crawford after she was transported to the Pennsylvania State Police Barracks at Shickshinny. The defendant initially denied knowing Ronald or Jeffrey Evans or anything about the incident. Crawford explained that a blood stain on her clothing was from "jacking deer".

After being advised that Jim Roche was cooperating with investigators and providing a statement Crawford's demeanor changed.

Trooper Polishan advised the jury that Crawford provided "variations of one long version". (Id. N.T. 132). These variations included not knowing Barney Evans at all and then one where she professed no knowledge of any shooting incident and one where she and Mr. Roche were involved, with variations of that. These versions are outlined at pages 132 through 139 of the transcript. The

23

defendant then agreed to give and audio-taped statement, which was played for the jury.

During her initial conversation with trooper Polishan, Crawford stated, in part, when Barney Evans apparently refused to answer the door at his residence Roche returned to the vehicle in which Crawford was sitting and instructed Crawford "to go up to the house and then to -- that they would answer the door for her". In this context Crawford made a comment to trooper Polishan that she would "act like a decoy. She was going up to the residence ; and specifically, she called the part of the residence the slider door. She was going up to the slider door." (Id. N.T. 136). When trooper Polishan further questioned Crawford about the decoy statement, because he was unsure of what she said, Crawford responded "A decoy. You know, like a duck." (Id. N.T. 136).

Trooper Polishan further testified when he asked Crawford about the location of the "gun" used by Roche to shoot Barney Evans, Crawford replied she didn't "know where the *guns* are". (Id. N.T. 137, emphasis supplied).

Trooper James P. Shubzda, a member of the Forensic Services Unit, responded to the murder scene and described examining the bodies and collecting multiple pieces of evidence including .22 caliber shell casings located in the driveway and residence of the victims.

24

Trooper Shubzda encountered Ronald Evans on the deck of the residence, lying face up. In close proximity was an object identified as a broken trigger mechanism from a rifle, Commonwealth's Exhibit 36-A. This trigger mechanism was located near the left foot of Mr. Evans.

The second victim, Jeffrey Evans, was found inside the home. Trooper Shubzda explained that based upon his experience and expertise Jeffrey Evans had been face down and then rolled over onto his back. (Id. N.T. 406). Jeffrey Evans was in a hallway adjacent to the kitchen area in and around which were found additional shell casings.

The witness descried the gunshot wounds observed on Jeffrey Evans, which included four wounds to the lower back and one gunshot wound to the back of the right ear. Based upon his observations trooper Shubzda indicated that Jeffrey Evans was either crawling on the ground or lying on the ground when the shots were fired. (Id. N.T. 417). Additionally, trooper Shubzda stated the shooter had to be near Mr. Evans head to inflict that gunshot wound. (Id. N.T. 417, 418).

Trooper Shubzda also conducted a search of Moya Linde's residence at 71 Dobson Road. The witness identified Commonwealth's Exhibit 64, a photograph of a broken .22 caliber rifle found on top of the refrigerator in the kitchen of the residence. This weapon, Commonwealth's Exhibit 15, exhibited a broken portion

of the stock and trigger mechanism. It was described as a semi- automatic loaded with nine live rounds.

During cross-examination trooper Shubzda indicated the trigger guard recovered at the scene of the Evans residence belonged to the gun recovered from the top of Moya Linde's refrigerator.

Trooper Joseph J. Pericci described the wooded area in which James Roche and Holly Crawford were taken into custody. The area was approximately 150 to 200 yards from Moya Linde's residence. Trooper Pericci, recovered seven knives, taken from the Evans residence, and a loaded .44 caliber revolver. (Id. N.T. 461, 464). Additionally recovered was a wooden display case missing from the victims home.(Id. N.T.472).

Trooper Pericci also recovered eight bullets taken from the bodies of Ronald and Jeffrey Evans during the autopsy. (Id. N.T. 474 through 479).

Dr. Gary Ross, the forensic pathologist who conducted the autopsies of Ronald and Jeffrey Evans on April 24, 2014 described, in detail, the nature of the gunshot wounds and recovery of bullets from the respective bodies.

Ronald Evans suffered four gunshot wounds, two to the front of his chest and two to the back. Dr. Ross expressed the opinion that all four of these gunshot

wounds were to a vital part of Mr. Evans body. Dr. Ross explained that the cause of death was multiple gunshot wounds and the manner of death- homicide.

Jeffrey Evans sustained recent wounds to his mouth, which occurred at or near his death. Additionally, Jeffrey Evans suffered five gunshot wounds. One was located at his right ear, three in a very tight location in the anterior chest and the fifth at the midline of the body.

Dr. Ross expressed the opinion that all five gunshot wounds were to vital areas of the body and that the cause of death was multiple gunshot wounds and the manner of death - homicide.

Holly Ann Crawford assumed the stand in her defense. It is important to observe the concise statement references pages 762 to 771 of her testimony in support of the assertion that the evidence was insufficient to convict the defendant of first degree murder and conspiracy. This relates to 9 pages of the defendant's testimony, which spans 91 pages of a trial transcript, consisting of 1205 pages.

At the inception of the defendant's testimony, in response to questions posed by her counsel, Holly Crawford stated unequivocally and emphatically that she did not shoot Barney or Jeff Evans; that it was never her intention that Barney or Jeff Evans "get shot"; that it was never her plan with James Roche to shoot

Barney or Jeff Evans and finally that it was never her intention that Barney or Jeff Evans "be shot". (Id. N.T. 724, 725).

The defendant indicated she resided at Dobson Road and further that James Roche lived there "on and off" for approximately one year and eight months.

The defendant stated she had no steady source of income and obtained sustenance by going to church every few weeks to get bags of food and also hunted deer "illegally". (Id. N.T. 727). In this regard the defendant testified she would hunt deer, every day, every night and during trips to the store.

The defendant advised the jury she had a heroin habit for approximately 15 years, which started when her father died. The defendant further related she was arrested for crimes such as burglary and robbery, which she attributed to her heroin addiction.

When asked by defense counsel why she was not pleading guilty in the instant matter Holly Crawford stated "Because, I didn't do anything". (Id. N.T. 729).

Crawford was next asked to display scars she purportedly received from James Roche. Additionally, she acknowledged a sexual relationship with one of the victims, Barney Evans. In describing this relationship Crawford stated "I

28

exchanged sexual favors for gifts and money, marijuana". Crawford also stated that Barney Evans would provide Klonopin or Xanax.

The defendant indicated that she knew Jeffrey Evans, Barney's son, whom she described as a friend.

The defendant testified she initially met James Roche and within three days they were "living together and intimate...unless we were fighting".

The defendant was asked about the broken gun, previously referenced in this opinion, and indicated it was "broken for months" prior to April 21, 2014.

Holly Crawford next described the damage James Roche inflicted on the residence. Additionally, Crawford testified that Roche choked her approximately ten times. Roche's conduct resulted in her hospitalization in July of 2013. The witness described the incident leading to the hospitalization. (Id. N.T. 740). Crawford additionally related a different incident in which Roche punched her in the back.

Crawford described the violence exhibited by Roche as escalating and that she would give him Xanax and marijuana to calm him down.

Crawford next described her use of "lots of alcohol" and marijuana. Her consumption of alcohol included vodka and beer and her consumption of

29

controlled substances included Klonopin. Crawford testified she would provide Roche with Klonopin because if she didn't "I would be at risk".

Crawford further indicated Roche would refer to Barney Evans as a "geriatric pimp" and would threaten Barney a "couple times a week".

The defendant's attention was directed to April 21, 2014. She indicated she was drinking vodka mixed with Kool-Aid the whole day. She further stated she was drunk and began watching a movie when Roche started talking about Barney Evans. Crawford related that Roche got louder so she told him to turn it off and make a drink. According to Crawford this only quieted Roche for a short period of time after which Roche stated " I'm going to go over there and fuck him up. I'm going to go over there and put a bullet in his head." (Id. N.T. 758). Since these were similar to threats previously uttered, Crawford stated she would tell Roche to make more drinks but within a few minutes "he'd start up again". (Id. N.T. 759).

The defendant stated during this time she was "[J]ust trying to make him seem like what he's saying is silly, like ridiculous." (Id. N.T. 759).

During this portion of her testimony Holly Crawford again stated she did not know Roche was actually going to shoot Barney Evans. (Id. N.T. 760).

When asked whether she said anything about Jeff Evans, Crawford responded "I said - - I don't know how Jeff came up, but I said, Go ahead. Jeff,

30

too. Yeah. He killed his cat". Crawford indicated this was said in a sarcastic tone, that Roche was being ridiculous. (Id. N.T. 761).

Crawford next testified she agreed to go with Roche simply to calm him down and she suggested "[W]e cruise past the fields, look for deer." (Id. N.T. 762). Crawford could not recall Roche walking out of the house with a gun but stated she recalled one being in the back of the vehicle.

When the defendant suggested they look for deer Roche purportedly responded "What we should do is just go get your fuckin' pills". Crawford testified that Roche was referring to her "Klonopin that were stolen" by Jeff Evans. (Id. N.T. 763).[5] Crawford stated she would accompany Roche to secure the stolen Klonopin. At some point "a little bit before Barney's house" Roche stopped the car and said " I'm going to get your pills". (Id. N.T. 764). Crawford testified she asked Roche what to do and he said come back and pick me up in twenty minutes. With that Roche retrieved his gun from the hatch. Crawford stated she came back in approximately twenty minutes to a half hour and Roche looked "very angry". (Id. N.T. 764). Crawford described Roche as standing in the road with his gun, and after putting the gun back in the car Roche 'flipped out, screaming." Roche purportedly told Crawford that the Evans house was "all shut up" and that

---

[5] Recall the testimony of Margaret Moran that the retrieval of Klonopin scenario was manufactured by the defendant and Roche after the murders.

31

"everything was shut off". Roche was screaming and Crawford advised the jury she felt "[L]ike he's going to put my head through the glass". (Id. N.T. 765).

At this point Crawford advised Roche she would retrieve the pills. "I'll go ask Barney for my pills". Crawford then pulls up into Barney's driveway, puts the vehicle in park and advises Roche to "Stay here". (Id. N.T. 766).

Crawford stated as she opened the vehicle door Roche opened the passenger door and was getting out of the passenger side. Crawford testified she didn't see where Roche was going so she simply continued walking to the front porch where Barney Evans "sticks his head out" and asks "What are you doing" to which Crawford responds "What's up". Crawford then walks onto the porch and "Barney steps aside inside the house to let me in, and I go in; and, I turn around and now Barney is marching out on the porch with his gun." (Id. N.T. 767). Crawford describes Barney as screaming "Where's that fuckin' lunatic".

At this point Crawford testifies she just wants to get Barney back into the house, but then "Jeff gets my attention". (Id. N.T. 768). When asked by her counsel what Jeff says Crawford responds "He's like, Hey. What's up? What are you doing? I'm, like, High. Jeff. How are you? I said, I was just driving around". (Id. N.T. 768).

Crawford next testifies that as she's having that conversation with Jeff she sees "Barney crumble". (Id. N.T. 768). Crawford is now "in shock" looking at

32

Jeff who doesn't say anything but is "jumping from foot to foot" when Roche runs into the house. Crawford states she doesn't do anything or say anything or even move as "Jim punches Jeff out, and Jeff lands flat on his back on the floor, the kitchen floor". (Id. N.T. 769). As Jeff gets up Crawford runs out of the house and gets back into the vehicle, seated on the passenger side. (Id. N.T. 771). Roche returns and is purportedly all out of breath and in possession of "knives" which he tells Crawford he took "to make it look like a robbery gone bad". (Id. N.T. 771).

Eventually Crawford tells her mother she wants to be taken to Philadelphia to get away from Roche. ( Id. N.T. 772).

Crawford states she does not recall speaking to her daughters Tristin and Alexa regarding Crawford's acknowledging the shooting.

During cross-examination the defendant acknowledges hearing Roche state he wants to kill Barney; agreeing to go with Roche and also making the statement about killing Jeff. (Id. N.T. 787). The defendant further acknowledges an awareness that Roche is armed with a gun and that the gun is in the vehicle.

Crawford describes the distance to Barney's house as approximately nine miles with a travel time of approximately 15 minutes.

Crawford specifically denies telling trooper Polishan that she was a decoy. (Id. N.T. 791). Additionally, Crawford is shown Commonwealth's Exhibit 36-A,

33

which she acknowledges is the trigger guard for her mother's gun. When asked how it got on the victims porch Crawford responds "I have no idea".

The defendant acknowledges that Roche had the, previously displayed, .22 caliber rifle with the strap and the scope with him that night but has no idea how the gun with the broken trigger guard got to Barney's home. (Id. N.T. 792).

When confronted with the statements made by her daughters Alexa and Tristin during trial, the defendant acknowledged hearing them and stated " I don't think they're lying". (Id. N.t 794).

Crawford further acknowledged she never told the Pennsylvania State Police that Barney had a gun. (Id. N.T. 796). Crawford also denied telling Maggie Moran that she shot Jeffrey Evans. The defendant further testified that she didn't really tell Moran anything about her case.

At the conclusion of cross-examination Crawford was asked whether she ever advised the state police that Roche was abusive towards her and she responded "No". When asked why not, Crawford stated "They didn't ask". Crawford further stated "I was just repeating what [the Pennsylvania State Police] were coming in the room telling me". She further stated that at no time during April 21, April 22 or April 23, 2014 did she contact 911 or report these murders to the police. (Id. N.T. 813).

34

During rebuttal the Commonwealth presented the testimony of five law enforcement officers who introduced evidence regarding four prior crimen falsi convictions of Holly Crawford.[6]

## LAW AND DISCUSSION

We have previously set forth appellant's allegations of error as they appear in the concise statement. We are constrained to make the following observations. Appellant's concise statement, in large measure, fails to appropriately identify or cogently set forth the nature of several of the issues raised. It contains, in large measure, conclusory, bald and boilerplate assertions lacking in substance. It is, concerning the issues of involuntary manslaughter, voluntary intoxication and the asserted insufficiency of the evidence, woefully inadequate and provides little, if any, assistance to the court. Such feebleness in the document is a clear indication, in our judgment, of the strength, validity and legal vitality of the propositions asserted.

As then Judge Stevens pertinently noted in Commonwealth v. Lemon, 804 A.2d 34(Pa. Super. 2002), Pa.R.A.P. 1925 is intended to aid trial judges in identifying and focusing upon those issues which a party plans to raise in an appeal. It is a crucial component of the appellate process and when a trial court has to guess what issues are being appealed meaningful review is impossible. A

---

[6] During his charge the Trial Judge explained how the jury could appropriately consider this evidence. (Id. N.T. 1107, 1108).

35

concise statement which is too vague to allow the court to identify the issues raised is the fuctional equivalent of no concise statement at all. Lemon considered an allegation that the evidence was insufficient and the verdict against the weight of the evidence. The appellant failed to identify specific reasons or even what element or elements were lacking. Superior Court determined the allegation was vague and the issued waived. Similarly, in Commonwealth v. Reeves, 907 A.2d 1(Pa. Super. 2006) the court noted "the Rule 1925(b) statement must be detailed enough so that the judge could write a Rule 1925(a) opinion, but not so lengthy that it does not meet the goal of narrowing down the issues previously raised to the few that are likely to be presented to the appellate court without giving the trial judge volumes to plow through". Id. at 3.[7]

Because of the nature of the instant matter, we will attempt to address or comment upon the issues raised.

The allegations regarding the trial court's refusal to give certain requested jury instructions have certain legal and factual overlap and will be considered together. On September 21, 2015 the trial judge conducted a charging conference considering, in part, the issues presently raised. (Id. N.T. 971 to 991). Similarly, appellant's assertion regarding conspiracy and sufficiency of the evidence are virtually identical and will be treated together.

---

[7] Given the paucity of reference to the transcript and the failure to identify any witness, other than the defendant, as well as the complete absence of citation to a statute, rule or case, this court was required to do significantly more than that contemplated by the cases referenced above.

36

## INVOULUNTARY MANSLAUGHTER

Appellant argues the trial court committed an error of law in failing to charge the jury on involuntary manslaughter.

It is incumbent upon a trial judge to only instruct a jury regarding an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. Instructions on matters which are not before the court or which are not supported by the evidence serve no purpose other than to confuse the jury. Commonwealth v. Patton, 936 A.2d 1170, 1176 (Pa. Super. 2007). In determining whether a trial court erred in refusing to provide a requested instruction, an appellate court determines whether the court abused its discretion or committed an error of law. Where a defendant requests a jury instruction on a particular defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record. If evidence exists to support the defense, it is then for the trier of fact to pass upon the evidence and improper for the trial judge to exclude such consideration by refusing the charge. Commonwealth v. Demarco, 809 A2.d 256, 260, 261 (Pa. 2002).

Section 2504 (a) of the Crimes Code sets forth the definition of involuntary manslaughter:

A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

This offense therefore requires 1) a mental state of either recklessness or gross negligence and 2) a causal nexus between the conduct of the accused and the death of the victim. Commonwealth v. Fabian, 60 A.3d 146, 151 (Pa. Super. 2013); Commonwealth v. McCloskey 835 A.2d 801, 806 (Pa. Super. 2003).

Appellate counsel fails to articulate any reason or reasons why the court erred in this regard. An examination of the relevant portion of the aforementioned charging conference reveals trial counsel stated the Commonwealth filed a charge of "open homicide". Defense counsel then referenced the involuntary manslaughter provision and stated "That is an issue for the jury, and I've discussed the matter with Ms. Crawford. She's asking for the instruction. So, I'm asking for the instruction." (Id. N.T. 978). Defense counsel additionally stated the Commonwealth indicated "[T]hat as a conspirator, as an accomplice, she went up on the deck. She asked-- she wanted Barney to come out. Once again, that is an act, whether it be lawful on her part in thinking that Jim Roche wasn't going to do anything or whether it be unlawful; and, it could be interpreted as reckless and, therefore, the charge is appropriate". (Id. N.T. 978, 979).

The Commonwealth voiced an objection noting the defense, throughout the entire case, asserted the defendant did nothing that caused the death of the victims.

38

The court thereafter denied the defense request. (Id. N. T. 979).

There is simply no evidence in this record which suggests that the killing or killings were in any way accidental or that the defendant acted recklessly or with gross negligence in the shooting of Barney or Jeffrey Evans.

Indeed, with regard to the requested instruction on involuntary manslaughter, as well as the requests for instruction on voluntary intoxication and duress, the record demonstrates, as outlined in detail above, that Ms. Crawford was adamant and unequivocal in her categorical denial of any involvement in the death of either or both of the victims.

## IGNORANCE OR MISTAKE

In this context appellant argues "[T]hat a reasonable explanation negates intent, knowledge, belief, recklessness or negligence required to establish the material elements of the crime charged. Defendant further argues that her belief that James Roche, her co-defendant would not follow through with his threats was reasonable because he had never followed through before. Testimony revealed that Roche made repeated, almost daily threats about Ronald Evans and never took action".

During the charging conference defense counsel requested an instruction pursuant to Pennsylvania Standard criminal Jury Instruction 8.304, entitled "Ignorance or Mistake". Counsel argued Crawford's belief that Roche would not

39

follow through "was certainly reasonable in that he had never followed through before". (Id. N.T. 981). The Commonwealth objected and the Trial Judge indicated that after reviewing the standard jury instructions as well as Commonwealth v. Scott, 73 A.3d 599 (Pa. Super. 2013) the requested charge would not be given.

In Scott a panel of the Superior Court examined a trial court's refusal to provide a mistake-of-fact instruction.[8] The factual context there considered involved a group of men, including Scott, engaged in the smoking, snorting, and injecting bath salts, a lawful practice at the time. The men were fearful because an individual named Jeremiah Shoop had attempted to "rob" Scott's house the night before, and because Shoop was making death threats against the men. While the group was in the apartment, one of those present received threatening phone calls from Shoop.

Shoop arrived at the apartment and in the ensuing melee Scott shot his friend believing he was Shoop. The Commonwealth pursued the charges of attempted murder and conspiracy against Scott with regard to Shoop and aggravated assault and recklessly endangering with regard to the friend, Josh Lemin.

During trial the defense proffered the theory of self-defense as to the charges related to Shoop, but asserted the theory of mistake-of-fact as to the charges related to Lemin.

---

[8] Colville, J. filed a Dissenting Opinion.

40

In reversing the trial court's refusal to charge on mistake-of-fact Superior Court concluded that the trial record established that a reasonable jury could have determined that Scott shot at Shoop intentionally, warranting a self-defense charge, but shot at Lemin mistakenly, warranting a mistake-of-fact charge. In arriving at this conclusion the opinion distinguished the Pennsylvania Supreme Court's holding in Commonwealth v. Harris, 665 A.2d 1172 (Pa. 1995). There the defendant asserted he shot in self-defense, because he observed the butt of a gun tucked into the victim's trousers. The defendant also asserted that the shooting was an accident, testifying that the gun "went off" as he was backing up and two individuals were trying to grab the gun. Scott observes the Supreme Court held that the evidence clearly established the defendant did fear immediate danger of death. The Supreme Court also determined that the defendant could not claim that he intentionally shot the victim while also claiming that the shooting was an accident. Harris instructs that where a defendant denies that the shooting was intentional a defense of self-defense is not available because it is mutually exclusive of the defense of accident or mistake.

As previously observed, Crawford's testimony in the instant matter was that she did not plan, intend, agree to participate or participate in the killing of one or both of the victims. She asked the jury to believe that she was on the victims porch simply to retrieve what she claimed was stolen Klonopin. Her asserted "belief"

41

that Roche would not kill Barney Evans because Roche threatened his life on numerous previous occasions does not implicate this defense as explained in either Scott or Illustration #5 of the Standard Jury Instructions.

The aforementioned illustration provides:

[5.    Let me illustrate what a mistake of fact might be. Suppose a person has a blue Ford, and parks it in the stadium parking lot. After the game, the person sees another blue Ford, and thinks it is actually his or her own car. If the person tries to enter it, it may be under a mistake as to the fact of whose car it is. In such a case you would have to decide, first, whether the person really believed this fact; you would then have to decide whether it was a reasonable mistake. Was the other Ford the same make and model; was it in the same general area in the parking lot; were there no distinguishing features? Finally, if the person did have the mistaken belief, and if making such a mistake was reasonable, you would have to decide whether that mistake eliminates an element of the crime. For example, if it were a crime to intentionally enter another person's car, the mistaken belief would mean that the individual here never intended to go into another person's car; the individual thought he or she was entering his or her own.]

To state the factual context of Scott and that posited in illustration # 5 is to distinguish them from the matter at bar.

Additional support for this conclusion is found in the factual context considered by Superior Court in Commonwealth v. Hamilton, 766 A.2d 874 (Pa. Super. 2001). There the defendant shot and killed the 18 year old son of his live-in girlfriend. The defendant was charged with murder and related offenses. The defendant claimed throughout the trial process that he mistakenly believed that the

42

murder weapon was in fact not loaded and that he was only trying to scare the victim who had grown too big for him to intimidate physically any longer. Defense counsel argued that this mistake of fact could negative the requisite state of mind, specific intent to kill, as well as the malice necessary to support a third degree murder conviction or aggravated assault. Superior Court reversed the trial court's refusal to give a mistake-of-fact instruction based upon the proffered defense.

Instantly, Holly Crawford at no time suggested that she shot either one or both of the victims unintentionally or believing that the firearm was unloaded. Indeed, the defendant consistently and steadfastly stated she never had either one or both of the .22's in her hands.

To reiterate, the defendant claims her categorical innocence. The defense essentially asked the jury to conclude that the defendant's actions and conduct during April 21, 2014 was simply an attempt to placate and dissuade the defendant and/or to just go along for a ride, either to shoot deer or retrieve stolen Klonopin. On need only consider illustration # 5 and the holdings of Scott and Hamilton to conclude those assertions do not implicate Section 304.

43

## DURESS

Initially we observe that Crawford's requested instruction on duress, as well as the requests regarding involuntary manslaughter, ignorance or mistake-of-fact and voluntary intoxication, cannot be considered in a vacuum, divorced from the testimony or evidence in this record and applicable law.

Regarding duress, we preliminarily note that the issue is not whether the defendant was in a state of duress on April 21, 2014 the issue, properly framed, is whether the defendant killed one or both of the victims as the result of duress as that term is understood in Pennsylvania jurisprudence.

During the charging conference the trial judge acknowledged the defense was seeking an instruction pursuant to Pennsylvania suggested Standard Criminal Jury Instruction 8.309.

In support of this request defense counsel stated:

> If evidence is presented that the defendant would reasonably believe she was under risk of harm, the charge is appropriate. The immediacy or the imminency is not a requirement of duress. Based on the totality of the circumstances and the evidence presented, we feel the instruction shouldn't be refused.
>
> There is no real indication that she recklessly subjected herself to the duress. She was a constant subject of the abuse by Mr. Roche, and we feel the charge would be appropriate.

(Id. N.T. 983, 984).

44

The Commonwealth voiced an objection and the Trial Judge indicated that, after reviewing relevant case law, "There is not sufficient evidence to support this instruction". (Id. N.T.986).

In Commonwealth v. Demarco, supra.,the Pennsylvania Supreme Court reversed a trial court's determination refusing to instruct the jury on the defense of duress. The defendant made statements to the police, and in court, which corroborated the allegations of an individual named Frank Lawra that a third individual had vandalized Lawra's automobiles. When it became apparent that these allegations were false, Demarco was charged with several offenses, including perjury and false swearing. Demarco's defense was that Lawra had coerced him into corroborating Lawra's story. In support, Demarco offered proof that he was borderline mentally retarded, and that Lawra had shot him with a BB gun, choked him, and threatened to deprive him of his social security checks or kill him if he did not comply. Demarco received social security as a result of his mental disability and was living with Lawra without transportation or sufficient money to move to alternative housing.

The Supreme Court, in an opinion authored by Justice Nigro, explained that subsequent to the enactment of Section 309 (18 Pa.C.S.§309), the Supreme Court has repeatedly recognized that the test for determining whether the evidence supports a duress defense is that set forth in the statute, rather than the common law test previously followed. Pursuant to Section 309, in order to establish duress

45

there must be evidence that: (1) there was a use of, or threat to use, unlawful force against the defendant or another person; and (2) the use of, or threat to use, unlawful force was of such a nature that a person of reasonable firmness in the defendant's situation would have been unable to resist it. (Id. 916 A.2d at 261, 262). Justice Nigro further explained that the force or threatened force does not need to be of present or impending death or serious bodily injury, rather the relevant inquiry under Section 309 is whether the force or threatened force was a type of unlawful force that a person of reasonable firmness in the defendant's situation would have been able to resist.

In examining the factual context there considered the Supreme Court concluded that the evidence was sufficient to present a question to the jury as to whether Demarco was subject to duress, that is, whether Demarco was subject to unlawful force and threats by Lawra that a person of reasonable firmness in Demarco's situation would not have been able to resist.

It is obvious from a review of Demarco that the defendant unlike Crawford presently, admitted engaging in the criminal conduct for which he was accused but defended by asserting he committed the crimes because of duress.

In Commonwealth v. Markman, 916 A.2d 586 (Pa. 2007) the Supreme Court considered a first-degree murder conviction and death sentence where the trial court, in part, refused to instruct on the defense of duress. In Markman the

46

defendant participated in the killing of Leslie White with her co-defendant William Houseman.

Beth Ann Markman's trial testimony and post-arrest statement contained evidence that she was subjected to duress by Houseman during and immediately prior to the kidnapping and homicide of Leslie White. The trial record also established that Markman failed to take advantage of potential opportunities to escape Houseman's control. These included an ability to seek help from a store clerk or ask that police be called. The opinion also references Markman's ability to run and seek help. However, the evidence also established that Markman had been subjected to "terrorization, assaults, and death threats over a 2-day period immediately prior to these events; she had already tried to escape from both the front and back doors of the trailer , and each time had been violently restrained from doing so by Houseman; and Houseman was at all relevant times in close proximity to Markman and in possession of a hunting knife". Id.916 A.2d at 609.

The evidence established Markman acted with Houseman to subdue the victim, bind her hands and feet with speaker wire, place a large piece of cloth in the victim's mouth, as well as a tight gag over the victim's mouth and around the back of her head. Additionally, Markman held the victim down while Houseman strangled her - killing her. Markman also assisted in disposing of the body and engaged in additional efforts to conceal evidence.

47

When Markman was questioned by law enforcement she claimed she participated in the killing because Houseman had threatened and terrorized her, again unlike Crawford in the instant matter.

The Supreme Court concluded that the evidence relied upon by the defense raised a question of fact as to whether she was subject to duress and further that the trial court could not, as a matter of law, conclude that the defendant fell within the exception outlined in Section 309(b).[9]

The present record is absolutely devoid of any evidence that James Roche asked, directed, required or threatened Holly Crawford to participate in the killing of one or both of the victims. Indeed, the previously referenced trial testimony by the defendant asserts she was trying to dissuade Roche and "get his mind off" carrying through on the threats.

As previously indicated, Holly Crawford essentially stated while she may have been present during the killings she did not participate in them. While a defendant can certainly be present and not participate, a defendant cannot participate and not be complicit.

Succinctly stated, there is no evidence in this record to establish that James Roche coerced Holly Crawford into killing or participating in the killing of Barney and/or Jeffrey Evans. The defendant unequivocally denied engaging in any

---

[9] In the conceptually related affirmative defense of diminished capacity the Pennsylvania Supreme Court has explicitly held that a defendant's testimony he was innocent of murder precludes the assertion of this defense. Commonwealth v. Cuevas, 832 A.2d 388, 393 (Pa. 2003).

48

conduct charged as a result of duress, as that term is defined in Section 309. Stated alternately, what conduct did James Roche engage in or exhibit that caused or required Holly Crawford to agree to kill, assist in killing or kill one or both of the victims? The answer based upon this record is none. As importantly, Holly Crawford repeatedly affirmed her innocence during her trial testimony.

## VOLUNTARY INTOXICATION

In Commonwealth v. Miller, 664 A.2d 1310 (Pa. 1995) the court explained in order to support a defense of voluntary intoxication, the evidence must establish that, at the time of the murders, the defendant was overwhelmed by the effects of alcohol to the point of losing her faculties and sensibilities, resulting in an inability to form the specific intent to kill.

In Miller the defendant was convicted of first degree murder and sentenced to death. Miller argued the trial counsel was ineffective for failing to present a voluntary intoxication defense. In rejecting this assertion the Supreme Court observed that Miller did not allege that he was too intoxicated to understand what he was doing "when he committed the murders" or that he was drunk. (Id. 664 A.2d at 1324).

Additionally, in Commonwealth v. Hutchinson, 25 A.3d 277 (Pa. 2011), an opinion referenced by the Trial Judge in declining defense counsel's request to instruct the jury on voluntary intoxication (Id. N.T. 983), the Supreme Court explains that a defense of diminished capacity, whether grounded in mental defect

49

or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill. Absent an admission from the defendant that he shot and killed the victim, trial counsel could not have presented a diminished capacity defense. If a defendant does not admit that he killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible. Id. 25 A.3d at 312 (citations omitted).

It is evident that the record establishes that Holly Crawford was drinking and may have been intoxicated on April 21, 2014. It is equally as evident that Holly Crawford did not "admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill" and thus a charge on voluntary intoxication was not appropriate.

## PHOTOGRAPHS OF VICTIMS

Appellate counsel suggests the trial court erred in permitting the Commonwealth to "publish pictures of the victims while they were alive" as this was prejudicial, inflammatory and irrelevant. Counsel fails to identify when or where in the transcript this occurred.

As referenced during the summary of Moya Linde's testimony the Commonwealth introduced photos of Barney Evans and Jeffrey Evans as Commonwealth's Exhibit 16 and 17 respectively.

50

Defense counsel initially voiced no objection to Commonwealth Exhibit 16 (Id. N.T. 225) but subsequently asserted an objection to the photos at a sidebar conference. (Id. N.T. 227).

In overruling counsel's objection the trial judge permitted the witness to identify both photographs and they were briefly displayed to the jury. The trial judge additionally gave a cautionary instruction regarding the photographs. (Id. N.T. 228). There was nothing about the nature or context of the photographs which was likely to invoke sympathy on behalf of the victims or towards the Commonwealth. Moreover, the complained of evidence merely offered a fleeting glimpse of the victims as live breathing human beings. The victim of a murder is not merely a prop and references to his humanity are not inherently and unfairly prejudicial. Commonwealth v. Tedford, 960 A.2d 1(Pa. 2008). We find no error warranting the grant of a new trial.

## SUFFICIENCY OF THE EVIDENCE

As previously indicated appellate counsel, in conclusory fashion, simply asserts that the evidence is insufficient to prove the defendant acted with malice, had a specific intent, or conspired to kill either of the victims referencing a sliver of the defendant's testimony.

In reviewing the sufficiency of the evidence, we consider whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as verdict winner, support the fact-

51

finder's determination that all the elements of the offense have been proven beyond a reasonable doubt. Commonwealth v. Montalvo, 956 A.2d 926 (Pa. 2008). In applying this standard, a reviewing court must bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence.

To obtain a conviction for first degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; that the defendant did the killing; and that the killing was done in an intentional, deliberate and premeditated manner, which the Pennsylvania Supreme Court has construed to mean that the defendant acted with the specific intent to kill. Commonwealth v. Cousar, 928 A.2d 1025, 1032 (Pa. 2007). Additionally, the Pennsylvania Supreme Court has, on numerous occasions, reiterated that a specific intent to kill may be proven by circumstantial evidence, and may therefore be inferred from the defendant's use of a weapon on a vital part of the victims body. See Commonwealth v. Cousar; Commonwealth v. Dowling, 883 A.2d 570 (Pa. 2005); Commonwealth v. Williams, 854 A.2d 440 (Pa. 2004).

In order to convict a defendant of conspiracy, the trier of fact must find that (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. Each member of a conspiracy to

52

commit homicide can be convicted of first – degree murder, regardless of who inflicted the fatal wound or who fired the fatal shot. Commonwealth v. Smith, 985 A.2d 886, 897 (Pa. 2009).[10] *See also* Commonwealth v. Patterson , 91 A.3d 55 (Pa. 2014).

Moreover, flight, along with other circumstantial evidence, may support an inference of a criminal conspiracy Commonwealth v. Devine, 26 A.3d 1139 , 1147 (Pa. Super. 2011) citing Commonwealth v. Marquez, 980 A.2d 145, 150 (Pa. Super. 2009) *(en banc)* appeal denied, 987 A.2d 160 (2009).

Additionally, a defendant may be found guilty of first degree murder as an accomplice. In this context the Commonwealth must prove beyond a reasonable doubt that the defendant independently possessed the requisite specific intent to kill. The specific intent to kill cannot be proven by evidence of intent to kill possessed by the defendant's accomplice or co-conspirator. Commonwealth v. Koehler, 36 A.3d 121, 153-154 (Pa. 2012) citing Commonwealth v. Huffman, 638 A.2d 961 (Pa. 1994).

The factual summary of the testimony and evidence in this case was undertaken not only to provide context for a consideration of the allegations of error regarding this court's refusal to instruct the jury on certain affirmative

---

[10] The holding in Smith is identical to that reached by the Pennsylvania Supreme Court in Commonwealth v. Boxley, 838 A.2d 608 (Pa. 2003) that all co-conspirators to first-degree murder can be found guilty regardless of who actually inflicted the wound resulting in death.

defenses but also to provide the reader of this opinion with more than a cursory understanding of the record.

Appellant's reference to a fragment of testimony from one witness, the defendant, in support of an argument that the evidence is insufficient not only fails to satisfy the requirements for this assertion, it stands the applicable law on its head.

Appellant counsel's reliance on nine pages of the defendant's testimony during direct examination blatantly ignores the testimony of the defendant's mother and two daughters, the later of whom the defendant confided in and confessed her guilt, as well as that of Margaret Moran. It additionally ignores the defendant's statements to the Pennsylvania State Police on the evening of her capture. This testimony has been summarized and will not be repeated.

The members of the jury were obviously free to conclude that the nine pages of testimony referenced by appellate counsel lacked plausibility. Indeed, the testimony concerning what occurred as Roche and Crawford watched Boondock Saints and eventually left was consistent. James Roche repeatedly expressed his intent to kill Barney Evans and Crawford suggested they should kill Jeffrey Evans. The jury was free to disregard testimony that Crawford's suggestion in this regard was merely sarcastic.

The evidence collected at the scene clearly established the presence of two weapons, one used by James Roche and one typically used by the defendant.

Holly Crawford called her daughter Tristin who she had not seen for two years-for what purpose? The fact-finder could reasonably conclude it was done with the express purpose of telling her daughter about her participation in the crimes.

The summarized evidence, including that of the defendant's cellmate, Margaret Moran, established the defendant used Barney Evans to obtain money and drugs. The jury was certainly free to conclude that Holly Crawford was not only manipulative and cunning but that she was clearly capable of murder and acted as an accomplice or principal in the killing of both victims.

Crawford categorically denied making certain statements to Trooper Polishan, such as acting as a decoy or duck on the porch, and advised the jury she only repeated what the state police told her. Recall that she initially denied knowing Barney Evans or having any knowledge of what occurred that evening. In this context, again, the jury could conclude that the defendant's variations or versions of what occurred related by Trooper Polishan implicated her in the murders.

Additionally, her attempt to go to Philadelphia and then hide in the woods with Roche, subsequent to the killings, was also evidence of her agreement to participate with Roche in these murders.

It is also interesting to note that Margaret Moran's testimony, during the Commonwealth's case in chief, foreshadowed Crawford's testimony regarding her

55

plan, hatched after the killings, to testify she went to the Evans residence to retrieve stolen Klonopin. Indeed, once the jury found Margaret Moran credible they could conclude that Crawford repeatedly communicated with a man, who she was purportedly afraid of, about potential defenses to these charges. The jury could have additionally concluded that Crawford understood and, in fact, instigated an argument with Roche about Barney to make Roche angry and jealous. The jury could have also concluded that Crawford planned to kill Barney, since that is what Crawford told Moran. The jury could have additionally concluded that items were taken from the Evans home to make it look like a robbery. The jury could have additionally concluded that Crawford herself shot Jeffrey Evans. The jury could have additionally concluded that Crawford and Roche planned to go to Philadelphia to sell the guns. The jury could have additionally concluded that Crawford's testimony about Barney Evans appearing with the handgun and a holster and threatening Roche was concocted after the murders in an attempt to fashion a self-defense theory.

Having presided in this matter it is obvious the jury resolved the issue of credibility in favor of the Commonwealth and against the defendant, who assumed the stand and although acknowledging traveling to and being present at the murder scene, denied killing or helping to kill anyone.

## SUPPRESSION

Appellant contends the court committed an error of law or abused its discretion in denying a previously filed motion to suppress.

On March 20, 2015, after a hearing conducted on February 26, 2015 this court issued a twenty-six (26) page memorandum addressing omnibus motions filed by both Holly Crawford and James Roche.

This memorandum discusses in detail the reasons for denying defendants motion to suppress statements. It is appended to this opinion as court's attachment 1. No further discussion is necessary or required.

### END OF OPINION

ORDER ATTACHED AS PAGE 58

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

Vs. : OF LUZERNE COUNTY

: -CRIMINAL-

:

JAMES EDWARD ROCHE, : NO. 2430 OF 2014

-----------------------------------------------------------------------------------------

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

Vs. : OF LUZERNE COUNTY

: -CRIMINAL-

:

HOLLY ANN CRAWFORD, : NO. 2431 OF 2014

CLERK OF COURTS
2015 MAR 20 AM 1: 37
CRIMINAL DIV.
LUZERNE COUNTY

## ORDER

AND NOW, this 20th day of March, 2015 upon consideration of both Defendants Omnibus Pretrial Motions and a Suppression Hearing conducted on February 26, 2015, IT IS HEREBY ORDERED AND DECREED AS FOLLOWS:

1.  Defendant Roche's Motion to Suppress statements is DENIED and DISMISSED for the reasons set forth in the attached memorandum.

2.  Defendant Crawford's Motion to Suppress statements is DENIED and DISMISSED for the reasons set forth in the attached memorandum.

Courts Attachment #1

BY THE COURT:

FRED A. PIERANTONI,   J.

Copies:

Mary Phillips, Esquire
District Attorney's Office
Luzerne County Courthouse
200 N. River Street
Wilkes-Barre, PA 18711

Jonathan Blum, Esquire
1208 Wyoming Avenue
Forty Fort, PA 18704

Paul Galante, Esquire
39 Public Square
Suite 1000
Wilkes-Barre, PA 18702

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

Vs.                      :          OF LUZERNE COUNTY

                          :            -CRIMINAL-

                          :

JAMES EDWARD ROCHE,         : NO.    2430   OF   2014

---

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

Vs.                      :            OF LUZERNE COUNTY

                          :            -CRIMINAL-

HOLLY ANN CRAWFORD,         : NO.    2431   OF   2014

## PA. R. CRIM. P. 581 (I) MEMORANDUM

Although the cases against the defendants in the above captioned matters have not been consolidated for trial, given the commonality of the factual context, nature of the charges and legal issues raised in their respective omnibus motions we will issue one memorandum with separate findings and conclusions regarding each defendant, where appropriate.

On December 2, 2014 counsel for defendant Crawford submitted an omnibus pretrial motion which included a motion to suppress statements allegedly made by the defendant on April 23, 2014. On February 24, 2015, counsel for defendant Roche submitted an omnibus pretrial motion which similarly included a motion to

1

suppress alleged statements made on April 23, 2013. On February 18, 2015 the Commonwealth submitted a brief in opposition to defendant Crawford's motion. A hearing on both motions was scheduled for and conducted on February 26, 2015.

By way of additional procedural history we observe the Commonwealth filed an information against defendant Roche on August 15, 2014 setting forth two counts of criminal homicide. The alleged victims are Ronald "Barney" Evans and Jeffrey Evans. A criminal information was issued on the same date against defendant Crawford alleging two counts of criminal homicide against the same victims. These offenses have as their genesis the alleged shooting of Ronald and Jeffrey Evans on April 21, 2014 at their residence located at 71 Sunset Lake Road, Hunlock Township, Luzerne County, Pennsylvania.

We also note that on February 26, 2015, prior to receiving testimony concerning the aforementioned statements, this Court disposed of the remaining issues in both omnibus motions.

With regard to the change of venue/venire request, submitted by defendant Crawford, it was agreed by counsel for the respective parties that the defendant would submit no evidence in this regard, rather a change of venue or venire would be considered only if it became evident a jury could not be selected during the voir dire process.

Both defendants requested individual voir dire. The Trial Judge observed that individual voir dire is not required in a case where the Commonwealth does not seek the death penalty. Voir dire will be conducted in accordance with the applicable rules of criminal procedure. The Court will address the prospective panel and ask general questions which may be supplemented by counsel. At the conclusion of the questioning an individual response or responses may be fully explored at side bar.

The Trial Judge further directed that respective counsel meet and review photographs which the Commonwealth seeks to introduce during trial. If an agreement cannot be reached regarding the photographs an additional pretrial will be conducted at which time the court will make a determination after hearing argument.

Additionally considered was the Commonwealth's request to introduce certain convictions of defendant Crawford in the nature of crimen falsi. The Commonwealth represented the defendant has two qualifying convictions pursuant to Pa. R.Crim. P. 609, i.e. burglary and robbery. This Court made an initial determination that the represented convictions would satisfy the aforementioned rule should the defendant take the stand, however, this determination could be revisited at trial.

3

The Trial Judge also considered and denied the Commonwealth's request, pursuant to Pa.R.E. 404(b), to have the warrant issued for the defendant's failure to appear at a D.U.I. sentencing introduced during its case in chief.

## FACTUAL CONCLUSIONS

### Holly Crawford Statement

Trooper Stephen Polishan was called by the Commonwealth and stated he has been a member of the Pennsylvania State Police since 1998. Trooper Polishan has conducted hundreds of investigations where he has an opportunity to see an individual who is under the influence of alcohol or a controlled substance. Trooper Polishan is currently assigned to the criminal investigation assessment unit at Troop "P" Wyoming.

On April 23, 2014 Trooper Polishan was directed to a wooded area in the vicinity of rear 71/75 Dobson Road in Hunlock Township. Trooper Polishan was advised that two individuals, armed with rifles, were in the woods and were suspects in a double homicide.

The witness stated he arrived in the aforementioned area between 1:00 and 2:00 p.m. on April 23rd. A large law enforcement contingent was present and attempting to locate and take Holly Crawford and James Roche into custody.

Trooper Polishan indicated Holly Crawford was taken into custody, but not immediately transported to the Shickshinny barracks for questioning because of the

4

perimeter which had been set up, the need to summon a transport vehicle and secure the presence of a female trooper.

Trooper Polishan was assigned to conduct an interview of Holly Crawford. Holly Crawford and James Roche were transported from the scene after which the witness finished certain assignments and proceeded to the Shickshinny barracks.

Trooper Polishan interviewed Holly Crawford, who was present in what was described as an interview room approximately 10 feet by 10 feet containing a table, chairs, bench, two-way mirror and a door. The defendant was not in handcuffs. Corporal Stephen Turinski was also assigned to conduct the interview of Holly Crawford.

Upon encountering the defendant Trooper Polishan explained who he was and why he wished to speak with her. Prior to conducting any questioning Trooper Polishan and Corporal Turinski utilized a "Pennsylvania State Police Rights Warning and Waiver Form" identified and admitted during the suppression hearing as Commonwealth's exhibit #1. The form was executed at 6:04 p.m. on April 23, 2014. The witness stated the defendant was advised of her constitutional rights by reading the form aloud and asking whether the defendant understood the rights as read. The defendant stated she understood the rights and further agreed to speak with the Pennsylvania State Police. Commonwealth's exhibit #1 contains the signature of Holly Crawford as well as that of Trooper Polishan and Corporal Turinski as witnesses.

5

The witness indicated the defendant asked no questions regarding her rights or waiver and at no time indicated she did not understand same.

The Assistant District Attorney asked Trooper Polishan to describe the defendant's demeanor. Trooper Polishan stated he asked Holly Crawford whether she ingested any alcohol and her response was not "in two days". The trooper additionally asked whether the defendant ingested any controlled substance, specifically heroin, and the defendant replied she had been "clean for two years".

The witness acknowledged that Holly Crawford appeared physically ill and that her eyes and nose were red. The defendant stated she was sick and Trooper Polishan asked "dope sick" to which the defendant responded she had flu like symptoms.

Trooper Polishan described defendant's speech as normal and further indicated she did not appear to be under the influence of alcohol or a controlled substance.

During the course of the interview the defendant was afforded the opportunity to use the bathroom. The witness also stated numerous cigarette breaks were taken during the interview. Additionally, the defendant was offered pizza and a soft drink.

During breaks in the interview process Trooper Polishan and Corporal Turinski were consulting other investigators regarding information discovered.

Trooper Polishan described the actual interview portion of his contact with Holly Crawford as between one and one half hours.

Trooper Polishan further stated that Holly Crawford was "cooperative" during the course of the interview. Trooper Polishan additionally indicated that Ms. Crawford was oriented to "date and time". Ms. Crawford's answers to questions posed was described as "appropriate".

The interview consisted of two parts, non recorded and recorded.

The defendant initially denied knowing either of the two victims.

The Commonwealth next introduced Commonwealth's exhibit #2 a compact disc of an audio recording of the statement outlined in a transcript, identified as Commonwealth's exhibit #3.

The Commonwealth played the aforementioned interview which began at 10:01 p.m. and concluded at 10:26 p.m. on April 23, 2014. The transcript of the tape consists of 18 pages. The audio statement contains a preface by Trooper Polishan which references the aforementioned Pennsylvania State Police Rights Warning Waiver form previously executed and further represents the defendant's preference to give a verbal statement of what she represents as "a truthful and accurate account of what happened". Further, Ms. Crawford acknowledges that the statement about to be recorded is "voluntary" and that she was previously advised

7

of her rights and waived same. Ms. Crawford further acknowledges her signature affixed to the rights and waiver form and that she understood the form.

Ms. Crawford spells her first and last name for the investigators and states that her date of birth is "11-15-74".

The interview proceeds in question and answer fashion. The tone exhibited by the Pennsylvania State Police is at all times conversational. Ms. Crawford's answers to the questions posed are responsive and appropriate.

At approximately eight minutes into the audio taped portion of the interview, at 10:09 p.m., Ms. Crawford's asks "...could we pause for one second". The tape is then stopped and it is represented that approximately five minutes later the tape is restarted. At this point Trooper Polishan states the defendant had a question concerning her medication and indicates that prior to the interview troopers were dispatched to 71 Dobson Road, in the area where Holly Crawford was taken into custody, to determine if medication, which may have fell out of her pocket or was left there inadvertently, could be secured. The medication inquired about is identified as heart medication and gallbladder medication. The interview then continues.

Ms. Crawford outlines the circumstances leading to the shootings. In describing her position in the residence during the shooting Ms. Crawford states "yeah that's where I was, Oh, my god I'm getting dizzy". Trooper Polishan asks if

8

she wished to take a second and Ms. Crawford responds "no keep going". Questions and answers then continue until the conclusion of the interview. Ms. Crawford affirmitavly represents that she is being truthful and honest with the troopers and acknowledges that no threats or promises have been made to her. In response to a question regarding whether she wants to add or subtract anything from the statement Ms. Crawford states "No".

Subsequent to playing the audio Trooper Polishan advised the Court the state police were not able to secure the medication. Additionally, Trooper Polishan stated that an ambulance was summoned to the barracks even though the defendant did not request to be taken to the hospital. The defendant was transported to the Geisinger Hospital in Plains Township and was released in "less than one hour". Ms. Crawford was thereafter transported for preliminary arraignment which was conducted before Magistrate District Judge John Hasay in Shickshinny.

During cross examination Trooper Polishan indicated there were multiple troopers and law enforcement vehicles in the area in which the two defendants were taken into custody. The witness stated his first observation of Holly Crawford was when she was in custody. Trooper Polishan stated that although the defendant may have been handcuffed as she was led into the interview room, she was not in restraints during the interview.

Both Trooper Polishan and Corporal Turinski were in plain clothes and armed.

9

Although the trooper could not recall the precise time that Ms. Crawford was taken into custody he reiterated that the Miranda warnings were administered at 6:04 p.m. on April 23, 2014. Trooper Polishan stated he was unaware of any Miranda warnings administered to Holly Crawford prior to those described.

Trooper Polishan stated that the defendant was not left alone during the interview process.

The witness acknowledged that during the process Ms. Crawford appeared to be tired and possibly ill and that she was at times "laying on the bench".

Trooper Polishan stated he did not "yell" at Ms. Crawford and further, in his judgment, Ms. Crawford was oriented to time and date.

In response to a question by defense counsel whether Trooper Polishan possessed any information that Ms. Crawford had been "drinking heavily" the witness responded he thought Ms. Crawford was sober and did not appear to be undergoing withdrawal.

During redirect examination Trooper Polishan stated the defendant was taken into custody at 3:30 p.m. on April 23, 2014. Trooper Polishan reiterated that the Miranda warnings were initially provided pursuant to the rights waiver form and then referenced again at the beginning of the audio taped interview.

The Commonwealth offered no other witnesses or evidence.

10

Holly Crawford assumed the stand and stated she did not know when she was apprehended. She was sleeping and "picked up by the hair" in a wooded area during the afternoon hours. She stated she had been drinking vodka and was dragged out of the woods by the state police. She indicated, at one point, she could not walk and collapsed and two troopers held her by each arm and dragged her.

Ms. Crawford further testified that she has a heart condition and prescribed medication for resulting seizures. She further related she has a vest with a device that can be employed if her heart stops.

This witness further indicated she was "very drunk" on the day she was apprehended and was "scared" for her health. Ms. Crawford stated she was "laying down" at times while at the Pennsylvania State Police barracks and further she was questioned for a "long period of time".

With regard to the audio statement provided Ms. Crawford indicated the answers were provided by the state police and then recorded.

Concerning the waiver of her constitutional rights, Ms. Crawford indicated it is "something she heard before" although she was not sure she understood. She described herself as "disconnected" and not clear headed. Ms. Crawford indicated she was "drunk" and that the alcohol was topped with Klonopin.

On cross examination she professed a lack of memory concerning aspects of the interview. The witness further stated she did not recall if she mentioned the

11

ingestion of Klonopin to the troopers. Ms. Crawford further stated she did not tell the troopers about the vest with the device to assist her heart. The witness testified she had a "scared feeling" that her heart would stop.

Upon further cross examination the witness acknowledged she was advised of her Miranda warnings on the day in question and further she was familiar with the criminal justice system as a result of numerous arrests in the past.

To the extent necessary for our present determination we resolve the issue of credibility in favor of Trooper Polishan and against Ms. Crawford.

James Roche Statement

Corporal Christopher King initially indicated he has been employed by the Pennsylvania State Police for sixteen years. Corporal King stated, in the course of his career, he has observed people under the influence of alcohol and or controlled substances on numerous occasions.

On April 23, 2014 Corporal King was at the Pennsylvania State Police barracks in Shickshinny and assigned to interview, along with Trooper Robert Franchella, James Roche. Corporal King initially encountered Mr. Roche between 4:00 and 5:00 p.m. Defendant Roche was placed in a conference room containing a large table. Mr. Roche was not restrained during the course of the interview.

Corporal King initially advised Mr. Roche that the Pennsylvania State Police were conducting a death investigation regarding Ronald and Jeffrey Evans.

12

At 5:56 p.m. on April 23, 2014 Corporal King, utilizing a "Pennsylvania State Police Rights Warning and Waiver Form", identified and introduced as Commonwealth's exhibit #1, advised the defendant of his <u>Miranda</u> warnings. The defendant thereafter signed the form acknowledging his constitutional warnings and agreed to speak with the investigators. Corporal King indicated the defendant had no questions regarding the rights and waiver form and at no time indicated a lack of understanding regarding his <u>Miranda</u> rights.

Corporal King described the defendant's demeanor as calm and cooperative. Mr. Roche advised Corporal King that he had been drinking vodka on the day the statement was given. Corporal King asked Mr. Roche if he had ingested any controlled substances and the defendant responded he had not.

Corporal King described the defendants speech as normal and further that his eyes appeared slightly bloodshot, but the defendant did not appear ill. Corporal King further testified that Mr. Roche did not appear to be under the influence of alcohol or a controlled substance.

Corporal King further advised the court that during the course of the interview Mr. Roche was provided bathroom breaks and had an opportunity to eat pizza and drink soda.

Corporal King reiterated that Mr. Roche displayed no outward signs of intoxication.

13

The witness advised the court that the interview with Mr. Roche lasted approximately two to two and a half hours, which includes the audio portion of the statement. Corporal King further stated the defendant was oriented to both time and date.

The Commonwealth next identified and introduced, Commonwealth's exhibit #2, a disc containing the audio portion of the aforementioned interview. The Court was also provided a transcript of the interview which consists of 64 pages.

The audio portion of the interview begins at 8:04 p.m. and concludes at 10:04 p.m. on April 23, 2014.

At the inception of the audio interview Mr. Roche acknowledges both his consent to the recording and the reading of his Miranda warnings. The warnings are then reiterated by Corporal King with the defendant acknowledging an understanding of each separate representation.

The interview was conducted in conversational tone and the defendant's answers to questions posed are responsive and appropriate.

During the course of the interview the defendant acknowledges going to the residence with the express purpose of assaulting Ronald "Barney" Evans and, thereafter, as events unfolded he shot Ronald and Jeffrey Evans.

Subsequent to the conclusion of the audio statement Corporal King advised the Court that Mr. Roche was transported for the purpose of preliminary arraignment before Magisterial District Judge Hasay.

During cross examination Corporal King indicated his first contact with the defendant was at approximately 5:50 p.m.. Corporal King indicated the only people in the interview room were himself, Trooper Franchella and the defendant.

Corporal King acknowledged that the defendant had bloodshot eyes, however, he was not slurring his words nor did he appear to be under the influence of alcohol. When asked whether the defendant exhibited an odor of alcohol, the witness responded the defendant exhibited several odors, one of which was described as a minor odor of alcohol.

Upon further cross examination Corporal King stated that during the process of the interview he was being advised of information learned by other investigators.

Corporal King was never at the wooded area or campsite where James Roche and Holly Crawford were discovered.

Corporal King further stated that the non recorded portion of the interview began at approximately 5:55 p.m. and one and one half hours later the taped portion of the interview began.

15

Corporal King further indicated that during the break in the audio portion of the statement he advised Mr. Roche he did not believe Mr. Roche's representations that Holly Crawford was not present at the scene of the shootings.

In response to further questions, Corporal King stated he did not lie to the defendant nor did he provide the defendant with "exaggerated facts".

The witness reiterated that he had an opportunity to observe the defendant walking and described his gait as normal. Corporal King reiterated that Mr. Roche did not appear drunk or under the influence of alcohol. Rather, Corporal King stated the defendant appeared normal.

Mr. Roche assumed the stand and initially testified he remembers only "bits and pieces" of the day he was taken into custody. Mr. Roche stated that on that day he purchased a half gallon of vodka at the liquor store at 11:00 a.m. He further indicated the day before he was taken into custody he consumed a fifth or more of vodka. Mr. Roche testified he drank virtually every day.

Mr. Roche stated he recalled speaking to the Pennsylvania State Police but that parts of the rights waiver discussion were "foggy". Mr. Roche testified he wished to speak to the police but "didn't put much thought into it".

The defendant stated that prior to being taken into custody he was "drunk" and took a handful of Ms. Crawford's heart medication when he saw the state police helicopter overhead.

16

On cross examination he testified he consumed a handful of the pills upon seeing the Pennsylvania State Police helicopter because he felt terrible and "wanted to die".

Mr. Roche acknowledged taking a break during the course of the interview.

To the extent necessary for our present termination we resolve the issue of credibility in favor of Corporal King and against Mr. Roche.

## ANALYLITICAL FRAMEWORK

Subsequent to the filing of a motion to suppress evidence, the Commonwealth bears the burden of going forward at a subsequent hearing establishing that the challenged evidence was not obtained in violation of a defendant's rights. Pa. R. Crim. P. 581(H); Commonwealth v. Dixon, 997 A.2d 368 (Pa. Super. 2010).

Statements stemming from a custodial interrogation or interview may not be used unless a defendant was apprised of his or her right against self incrimination and right to counsel embodied in Miranda.[1] It is also imperative that a defendant waive these constitutional rights. This waiver must be the result of a free and deliberate choice rather than intimidation, coercion, or deception, and the choice must be made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Commonwealth v. Watkins, 843 A.2d 1203, 1213 (Pa. 2003), cert. denied 125 SC 450. While Fifth Amendment

---

[1] Miranda v. Arizona, 86 S.Ct. 1602 (1966).

17

jurisprudence does not require an explicit waiver of <u>Miranda</u> rights, Pennsylvania has developed what is described as a "nuanced approach" which requires the defendant express a manifestation of his or her desire to waive <u>Miranda</u>. <u>Commonwealth v. Baez</u>, 21 A.3d 1280 (Pa. Super. 2011).

Recently, in <u>Commonwealth v. Bryant</u>, Justice McCaffery, author of the opinion, instructs that the test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. <u>Commonwealth v. Bryant</u>, 67 A.3d 716, 724, 725 (Pa. 2013).[2]

<u>Bryant</u> further informs the mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement does not constitute grounds for suppression. The opinion thereafter sets forth numerous factors which Pennsylvania jurisprudence considers under a totality of the circumstances test to determine whether a statement was freely and voluntarily made. They are:

> -The duration and means of interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof;
>
> -The length of the accused's detention prior to the confession;-Whether the accused was advised of his or her constitutional rights;

---

[2] <u>Bryant</u>, references <u>Commonwealth v. Perez</u>, 845 A.2d 779, 787 (Pa. 2004), an opinion in which the Supreme Court discarded application of the so-called "six-hour rule" established by <u>Commonwealth v. Davenport</u>, 370 A.2d 301 (Pa. 1977) and <u>Commonwealth v. Ducan</u>, 525 A.2d 1177 (Pa. 1987).

-The attitude exhibited by the police during the interrogation;

-The accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated;

-The conditions attendant to detention, including whether the accused was deprived of food, drink, sleep, or medical attention;

-The age, education and intelligence of the accused;

-The experience of the accused with law enforcement in the criminal justice system;

-Any other factors which might serve to drain one's powers of resistance to suggestion and coercion;

Additionally, when considering alleged impairment our appellate courts have repeatedly observed the fact that an accused has been drinking does not automatically invalidate his or her subsequent incriminating statements. Rather, the test is whether he or she had sufficient mental capacity at the time of giving the statement to know what he or she was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make a confession inadmissible, but goes to the weight to be accorded to it. When evidence of impairment is present, it is for the suppression court to decide whether the Commonwealth has established by a preponderance of the evidence that the suspect nonetheless had sufficient cognitive awareness to understand the Miranda warnings and to choose to waive these rights. Commonwealth v. Ventura, 975 A. 2d 1128, 1138 (Pa. Super. 2009).

In <u>Ventura</u> a law enforcement officer testified he did not observe indications the defendant was inebriated when he first arrived on the scene, although he smelled the odor of alcohol and it was apparent the defendant had been drinking. The officer further testified the defendant did not slur his speech, stagger, stumble or display other types of behavior which would permit the conclusion he was intoxicated.

There, Superior Court affirmed the trial court's determination that Mr.Ventura knowingly waived his <u>Miranda</u> rights, concluding that defendant had sufficient mental capacity at the time of giving his statement to know what he was saying. The suppression testimony revealed that Ventura was cognizant of time and place and had no difficulty walking, did not slur his speech and demonstrated he was capable of making decisions when he chose not to answer certain questions because he feared incrimination.

Furthermore, as observed by the Pennsylvania Supreme Court in <u>Commonwealth v. Phillistin</u>, 53 A.3d 1(Pa. 2012), a determination of whether a statement or confession is involuntary focuses not upon whether a suspect or defendant would have given a statement or confessed without the interrogation, but whether the questioning or interrogation was so manipulative or coercive that it deprived the defendant of his or her ability to make a free and unconstrained decision to provide a statement or confess.

20

## LEGAL CONCLUSIONS

Turning to the instant matter we initially observe it is undisputed that both Holly Crawford and James Roche were in custody, as that term is understood in Pennsylvania jurisprudence, when the statements at issue were provided.

### Holly Crawford

The suppression record establishes that Holly Crawford was taken into custody by the Pennsylvania State Police at approximately 3:30 p.m. on April 23, 2014. The record contains no testimony from the members of the state police who actually located or took Ms. Crawford into custody. Ms. Crawford was transported to the Pennsylvania State Police Barracks in Shickshinny and questioned by Trooper Polishan and Corporal Turinski.

At 6:04 p.m., prior to any questioning, Ms. Crawford was advised of her Miranda warnings utilizing the "Rights Warnings and Waiver Form" described above. The testimony establishes Ms. Crawford was advised of each of her constitutional warnings, understood them and agreed to speak to the troopers. This conclusion is warranted based upon the testimony of Trooper Polishan, our review of the Rights and Waiver Form and defendant's affixed signature acknowledging she was advised of her Miranda warnings understood them and further agreed to speak with law enforcement. It is additionally buttressed by the audio tape

21

referencing the administration of <u>Miranda</u> warnings and the defendant's understanding of same.

We will next review the factors articulated in <u>Bryant</u> to determine if the statement was voluntary.

Ms. Crawford's interrogation began at 6:04 p.m. and concluded at 10:26 p.m.. The duration of the interrogation was therefore 4 hours and 22 minutes. In this regard we have further examined whether the questioning was repeated. Ms. Crawford was initially questioned concerning the circumstances of her involvement in this matter and next agreed to an audio taped statement. The questions were therefore repeated once. We cannot conclude the questioning was prolonged, based upon it's previously described length, given the numerous breaks requested and afforded Ms. Crawford for cigarette smoking, eating, and drinking. Furthermore, the record is absolutely devoid of any evidence that Ms. Crawford was physically abused or the subject of threats by law enforcement.

Ms. Crawford was in custody for approximately two and a half hours prior to the statements.

Ms. Crawford was advised of her constitutional warnings prior to law enforcement engaging in any interrogation.

The attitude exhibited by the Pennsylvania State Police during the questioning was conversational in tone, respectful and accommodating.

22

Ms.Crawford advised the troopers she was and appeared to be physically ill, although she denied being under the influence of alcohol or controlled substances.

There is nothing about the conditions attendant to the detention which suggest involuntariness, given that Ms. Crawford was provided numerous breaks, pizza and a soft drink. Moreover, when she requested that the state police attempt to find what was described as heart medication they obliged, albeit unsuccessfully.

Ms. Crawford's age in no way suggests the statement was involuntary. Indeed, the record establishes Ms. Crawford was familiar with law enforcement and the criminal justice system, having been arrested on previous occasions.

Ms. Crawford advised Trooper Polishan that she had not consumed alcohol in two days nor a controlled substance in two years. Furthermore, Ms. Crawford denied being "dope sick" and attributed her feeling ill to flu like symptoms.

Having credited Trooper Polishan's testimony we accept his observations that Ms. Crawford's speech was normal and that she did not appear to be under the influence of alcohol or a controlled substance.

Additionally, we had the opportunity to actually hear Ms. Crawford's voice during the audio portion of the interview and discerned nothing in her tone or responses which suggests she lacked an understanding of the questions posed or that the questioning was so manipulative or coercive that it deprived her of an ability to make a free and unconstrained determination to provide a statement.

23

Additionally, although not requested by Ms. Crawford, it was decided to nevertheless summon an ambulance after which she was transported to the Geisinger facility in Plains Township and released within one hour. The record is devoid of any evidence or testimony concerning what, if any, medical treatment Ms. Crawford received or what if any conclusions were reached by medical personnel.

The record does not establish at what time Ms. Crawford's preliminary arraignment occurred.

Applying the totality of the circumstances test we conclude, in balance, that the statement provided was voluntary.

## James Edward Roche

Employing the criteria set forth in the analytical framework section of this memorandum and referenced and considered in the context of Ms. Crawford's statement we conclude, without hesitation, that Mr. Roche was advised of his Miranda warnings and agreed to be interviewed.

The Pennsylvania State Police Rights, Warning and Waiver Form introduced as Commonwealth's exhibit #1 and signed by Mr. Roche establishes, within the context of Corporal King's testimony, that the defendant was fully aware of his constitutional rights and agreed to waive same. Mr. Roche's awareness and understanding of the rights outlined in the aforementioned exhibit is reiterated and

24

reinforced at the inception of the audio taped statement of 8:04 p.m., which has been referenced in the factual findings.

Additionally, we have examined the totality of the circumstances employing the criteria previously described.

The Pennsylvania State Police began questioning Mr. Roche at 5:56 p.m. on April 23, 2014. The questioning concluded at 10:30 p.m. The length of the questioning is therefore four hours and forty minutes.

The questioning was repeated in the same sense as was Ms. Crawford's. Mr. Roche initially spoke with law enforcement and then agreed to provide an audio taped statement. We cannot conclude that the statement was unduly prolonged, given the breaks afforded during the questioning.

The record is absolutely devoid of any physical abuse or threats directed at Mr. Roche.

The record does not establish the time Mr. Roche was taken into custody and therefore we cannot consider the length of the accused detention prior to the confession. Furthermore, the record does not establish the time of the defendant's preliminary arraignment.

As previously indicated Mr. Roche was advised of his constitutional rights.

The attitude exhibited by the Pennsylvania State Police during the interrogation was conversational and at all times appropriate.

There is nothing in the record regarding the accused physical or psychological state which permits or suggests the conclusion that the statement was involuntary. Indeed, the testimony and audio taped statement establish the opposite, that is, that Mr. Roche was calm, cooperative and responsive.

While Corporal King acknowledged that the defendant's eyes were slightly bloodshot, the testimony establishes that he was not under the influence of alcohol or controlled substances and that he was afforded a bathroom break and ate pizza and drank soda. Furthermore, the record establishes Mr. Roche displayed no outward signs of intoxication.

There is nothing in the record regarding the education or intelligence of the accused which would suggest he was incapable of making a voluntary statement. Indeed, his tone, demeanor and choice of language during the interview suggest the conclusion of voluntariness.

Examining the totality of the circumstances, we conclude the Commonwealth has sufficiently established Mr. Roche's statement was voluntary.


END OF MEMORANDUM